(Decided 23rd November, 1888.)

---

HENRY T. DALY *vs.* GEORGE W. MORGAN, Treasurer of Baltimore County, and the MAYOR AND CITY COUNCIL OF BALTIMORE.

*Constitutional law—Act of* 1888, *ch.* 98, *Extending the Limits of Baltimore City—Legislative power—Changing County lines—Taxation—Article* 15 *of Declaration of Rights—Equality and Uniformity in Taxation.*

The Act of 1888, ch. 98, extending the limits of Baltimore City by including therein parts of Baltimore County, is not in conflict with section 1 of Article 13 of the Constitution, relating to the

Daly *vs.* Morgan, *et al.*

organization of new counties, the location of county seats and the changing of county lines, which provides that no lines of any county shall be changed without the consent of a majority of the legal voters residing within the district, which under the proposed change, would form a part of a county different from that to which it belonged prior to the change.

The Legislature has the power to extend the limits of Baltimore City by including therein parts of Baltimore County, with or without the consent of a majority of the voters residing within the districts annexed.

Section 19, of the Act of 1888, ch. 98, which provides that until the year 1900, the rate of taxation for city purposes on all taxable property within the districts to be annexed shall not exceed the existing tax rate in Baltimore County, does not conflict with Article 15 of the Declaration of Rights, which declares that " every person in the State, or person holding property therein, ought to contribute his proportion of public taxes, for the support of the government according to his actual worth in real or personal property." (ALVEY, C. J., *contra.*)

The principle of equality in taxation is fully gratified by making local taxation equal and uniform as to all property within the limits of the taxing district.

Equality and uniformity, as between different taxing districts, whether the district be an entire city, or parts of a city, is not required in local taxation.

Whether the rate of taxation prescribed by the Act of 1888, ch. 98, within the annexed district, is to be construed as a contract, and therefore binding till the year 1900, or a mere exemption or privilege which a subsequent Legislature may repeal, *Quære?*

The Act of 1888, ch. 98, is not rendered invalid as a whole, even though the provision limiting the rate of taxation within the annexed district during a certain time, be void.

The Act of 1888, ch. 98, extending the limits of the city of Baltimore by annexing thereto parts of Baltimore County, would have been unconstitutional and void, if it had not submitted the question of annexation to the legal voters of the districts to be annexed. *Per* ALVEY, C. J., and BRYAN, J.

APPEAL from the Circuit Court for Baltimore County, in Equity.

Daly *vs.* Morgan, *et al.*

The bill of complaint in this case alleged that the plaintiff, Henry T. Daly, was a tax-payer, and resided in Baltimore County—in that portion usually designated "The Belt"—and had paid his taxes on real and personal property for 1888, and prior years. The bill recited the passage of the Act of 1888, ch. 98, entitled "An Act to extend the limits of Baltimore City, by including therein parts of Baltimore County," and that in pursuance of the provisions of said Act, a majority of the voters in the territory described in the first section of the Act, known as the Northern section of the Belt, had voted in favor of its annexation, and that the Governor had by his proclamation so announced. The bill then alleged that by the twenty-third section of the Act the Treasurer of Baltimore County was required to pay one-half of the taxes collected for the year 1888, from such portions of the territory as should be annexed to Baltimore City, to the Mayor and City Council of Baltimore, and that he intended and was about to do so. The complainant then averred that said Act was void as being unconstitutional; and prayed that George W. Morgan, the Treasurer of Baltimore County, be enjoined from paying any of said taxes to the Mayor and City Council of Baltimore, and that the Mayor and City Council be restrained from receiving any of said taxes. The answer of the Mayor and City Council of Baltimore admitted all the allegations of the bill, except that of the unconstitutionality of the said Act, which it averred to be in all respects, constitutional, and valid, and asked for the dismissal of the bill. The answer of Morgan admitted all the allegations of the bill. The Circuit Court (FOWLER, J.,) on the 6th of June, 1888, passed a *pro forma* order refusing the injunction asked for. From this order the complainant appealed.

Daly *vs.* Morgan, *et al.*

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, IRVING, BRYAN, and McSHERRY, J.

*W. Frank Mitchell,* and *David G. McIntosh,* for the appellant.

*Winfield J. Taylor,* and *Bernard Carter, City Solicitor,* for the appellee, the Mayor and City Council of Baltimore.

*George W. Morgan,* appellee, submitted on his answer.

ROBINSON, J., delivered the opinion of the Court.

The 19th section of the Act of 1888, chapter 98, entitled an "Act to extend the limits of Baltimore City, by including therein parts of Baltimore County," provides: First, that until the year 1900, the rate of taxation for *city purposes* on all taxable property within the districts to be annexed, shall not exceed the then existing tax-rate of such property in Baltimore County, and that until said year, no increase shall be made in the assessment of such property.

Second, that until the year 1900, the city of Baltimore shall expend, within the districts annexed, an amount equal to the revenue derived therefrom by taxation, in affording to the residents within such districts, the rights and privileges enjoyed by residents within the present limits of the city.

The Act further provides, that the question whether the several parts of Baltimore County, shall be annexed to the city, shall be submitted to the legal voters residing therein respectively.

The main questions arising upon the construction of this Act are: First, the constitutional power of the Legislature, to extend the limits of Baltimore City, by including therein parts of Baltimore County.

And secondly, its power to discriminate in the rates of assessment and taxation, for *city purposes,* as between property within the districts annexed under the provisions of the Act, and property within the former limits of the city.

The power of the Legislature to extend the limits of a city, by including therein parts of the county adjoining, when the city itself is a part of the county, is not and cannot be questioned. It is contended, however, that Baltimore City being a separate and independent territorial division of the State, and not a part of Baltimore County, the Legislature has no power to change the lines of the county by annexing part of its territory to the city. And in support of this contention, the appellant relies entirely upon section 1, of Article 13, of the Constitution. After providing for the organization of new counties, and for locating county seats, this section further provides: "Nor shall the lines of any county be changed without the consent of a majority of the legal voters residing within the district, which, under said proposed change, would form a part of a county different from that to which it belonged prior to said change." It does not say, as has been argued, that the lines of a county shall not be changed *except it be for the purpose* of annexing parts of one county to another county. It merely provides that when the lines of a county are to be changed for this purpose, it must be done with the consent of a majority of the voters residing within the district to be annexed. The object, and sole object, of this provision of section 1, was to provide for the annexation of parts of one county to another. The entire section in fact, and the article in which it is to be found, deals exclusively with the organization of "*new counties,*" "*the location of county seats,*" *and the mode* by which parts of one county may be annexed to another county, and the

Daly *vs.* Morgan, *et al.*

limitation imposed upon the legislative power is in respect of these matters and these only.

Counties are political divisions of the State, organized with a view to the general policy of the State, and the functions and powers exercised by them have reference mainly to such policy. Besides, their representation in the General Assembly is fixed by the Constitution, and we can understand why it was deemed proper to make some provision in regard to the organization of counties, and the annexation of parts of one county to another. Towns and cities however are ordinarily chartered at the instance, and mainly with reference to the interest, convenience and advantage, of persons residing within the particular locality incorporated. They are chartered by the Legislature, and their boundaries are fixed by it, and the power to extend them, whenever in its judgment the public interests require it, has been exercised by the Legislature from the earliest days of the colony. No reason has been suggested why the Constitution should prohibit the exercise of this power, and it would seem strange, that it should provide for the annexation of parts of one county to another, and deny to the Legislature the power to extend the limits of a city, by including therein parts of an adjoining county, even though such county should be a separate and independent territorial division of the State. No one knew better than the framers of the Constitution of 1867, that the time must come, and that not far distant, when the extension of the limits of a great city like Baltimore would be absolutely necessary to its proper growth and development. And if they meant to deny the exercise of this power by the Legislature, and to say that its limits as then defined by its charter, should for all time remain the same, it is but reasonable to presume that this intention would have been declared in plain

and explicit terms. So far from being expressly declared, there is nothing either in the language or terms of this section from which such an intention can be inferred. The Legislature has, therefore, in our opinion, the same power now which it has always exercised, to extend the limits of Baltimore City by including therein parts of Baltimore County, and this too, *with or without the consent* of a majority of the voters residing within the districts annexed.

And this brings us to the question as to the power of the Legislature to prescribe different rates of assessment and taxation for *city purposes* as between property within the districts annexed under the provisions of the Act, and property within the former limits of the city. We cannot agree that the discrimination made in this respect by the 19th section, is in itself inequitable or unjust. The larger part of the territory annexed under the Act of 1888, embraces vacant outlying lots and farming lands, and the plainest principles of justice would seem to require a qualified exemption of such property for a limited period at least, from the heavy burden of city taxation. It must be some time before such property can be available for building or business purposes, or can enjoy the full benefits and privileges of the city government. And if local taxation is founded on, or in any manner qualified by, the principle of local benefits, there ought to be in all fairness some apportionment in the rate of taxation between such property, and property more advantageously located. But the question, it is said, is not one of abstract justice, but of constitutional power to make such apportionment. And it is insisted that all property within the limits of a city, without regard to its location, or condition, whether improved or unimproved, must, under the Constitution of this State, be subject to the same rate of taxation for city purposes.

Daly *vs.* Morgan, *et al.*

And in support of this contention, the appellant relies upon the Fifteenth Article of the Declaration of Rights, which says, " that every person in the State, or persons holding property therein, ought to contribute his proportion of public taxes for the support of the government according to his actual worth in real or personal property." Now it can hardly be necessary to say that this Article in the Declaration of Rights is to be found word for word in every Constitution adopted in this State. We shall not stop to consider the many cases in which it has been the subject of construction by this Court, nor the conflict of opinion as to the precise limitation thereby imposed on the taxing power of the State. Whatever may be the diversity of opinion in this respect, all agree, that the contribution by every one, of his proportion of public taxes levied for the support of the government, according to the value of his property, necessarily implies equality of taxation on all *taxable property*. We say taxable property, for although the abstract declaration in the Bill of Rights may be said to subject all property to taxation, yet it has always been held, that the Legislature may exempt from taxation such property as in its judgment a sound policy may require. Nor can we agree with the appellees, that this principle of equality applies only to taxes levied by the State for State purposes. Cities and counties are but local divisions of the State, organized and chartered for the more efficient and economical administration of the government. As such, they have no inherent power of taxation. The Legislature itself may levy needful taxes to defray the general expenses of such cities or counties, or it may delegate this power to the local authorities. These expenses of a city or county, for example, expenses for the administration of justice, the support of the poor, educational purposes, the maintenance of the public

highways and other like expenses, are public or governmental expenses, and the power of taxation, exercised by the local authorities, to defray such expenses, is a delegated power derived from the Legislature. The Legislature, however, cannot delegate a power prohibited by the Constitution. And the taxing power, therefore, when exercised by the city or county authorities, is but the exercise of the taxing power of the Legislature delegated to them, and is subject to every constitutional limitation to which the taxing power of the Legislature is subject. And if so, a tax levied for public purposes, whether levied by the State, county or city authorities, must be equal and uniform throughout the State, county, city, or taxing district, to which it applies. A city however is but the creature of the Legislature, from which its power of taxation and all other powers are derived, and the same power which authorizes the Legislature to make one taxing district of an entire city, equally authorizes it to make two or more taxing districts, if in its judgment the public interests require it. The responsibility for establishing such taxing districts, rests upon the law-making power, and the principle of equality is fully gratified by making local taxation equal and uniform as to all property within the limits of the taxing district. Equality and uniformity as between different taxing districts, whether the district be an entire city, or parts of a city, is not required in local taxation. Each city, county, or taxing district, may have its own rate of taxation. It may be one rate in one city, county or taxing district, and a higher or less rate in another county, city, or taxing district, and such inequality has never been held, or even supposed, to be in conflict with the Fifteenth Article of the Bill of Rights. Now the effect of the provisions of the nineteenth section, is to make the territory annexed under it a *separate*

taxing district, within the limits of the city as thus extended, and the Legislature itself, exercising its reserved right of taxation, fixes for a limited period the rates of assessment and taxation for local purposes, within such district. That it may exercise this power instead of delegating it to the local authorities, is well settled in this State. *State vs. Mayhew,* 2 *Gill,* 487; *State vs. Sterling,* 20 *Md.,* 502. And the rates of assessment and taxation prescribed by the Act being equal and uniform as to all property within the taxing district or territory annexed, there is no ground on which it can be said that its provisions are in conflict with the Bill of Rights. And such has been the uniform legislative construction of the Bill of Rights for a period now of almost one hundred years. As far back as 1795, the Legislature prescribed a different rate of taxation for property within Baltimore County, and Baltimore Town, which at that time formed a part of the county. In other words, it made Baltimore Town a separate taxing district. And then again the Act of 1816, chapter 209, entitled "an Act to enlarge the bounds of Baltimore City," provided that no part of the city tax, of two dollars in the hundred pounds, should be imposed on any real or personal property within any of the new wards annexed, "until there shall be at least five dwelling houses on each acre of land." And then came the Act of 1817, chapter 148, which provided that commissioners should be appointed by the Governor "to ascertain and mark out the limits within said city so far as the same is, in their judgment, thickly settled, built up or improved," &c., and that "the Mayor and City Council shall not have power to impose any direct tax upon the property without the said limits so to be ascertained."

The same power was exercised by the Acts of 1823, chap. 185; 1827, chap. 88; 1830, chap. 139; 1838, chap.

168, and 1842, chap. 218. These several Acts were passed when the Constitution of 1776 was in full force, in which the Thirteenth Article of the Declaration of Rights is identical word for word with the present Constitution. The constitutionality of these laws has never been questioned; and so far as we know they have never been supposed to be in conflict with the letter or spirit of the Bill of Rights.

This legislative construction was known to the framers of the present Constitution and to the people who adopted it, and we must presume they accepted it, as the proper construction of the power of the Legislature under this Article of the Bill of Rights.

The same power, too, has been exercised by the Legislature in other States, under Constitutions in which the principle of equality and uniformity of taxation is declared in explicit terms; and its exercise has been sustained by the Courts in these States and by the Supreme Court of the United States. *Serrill vs. Philadelphia,* 38 *Penn.,* 355; *Gillette vs. City of Hartford,* 31 *Conn.,* 351; *City of Henderson vs. Lambert,* 8 *Bush,* 607; *Benoist vs. St. Louis,* 19 *Mo.,* 179; *United States vs. Memphis,* 97 *U. S.,* 292.

We do not rest, however, our decision upon these cases, entitled as they are to the highest consideration, but upon what we understand to be the spirit and meaning of our own Constitution.

Whether the rate of taxation prescribed by the Act is to be construed as a contract and, therefore, binding till the year 1900, or a mere exemption or privilege which a subsequent Legislature may repeal, is a question in regard to which we express no opinion. If it cannot be sustained as a contract because the Legislature has no power to make such a contract with the voters of a county, or with a municipal corporation, or for any other reason, this would not affect the

validity of the entire Act. Parts of an Act may be valid and parts invalid, and it is only when all the provisions are so mutually connected with, and dependent on, each other, that it cannot be presumed the Legislature would have passed the one without the other, that the invalidity of one of the provisions affects the validity of the entire Act. *Mayor and Council of Hagerstown vs. Dechert*, 32 *Md.*, 369; *Township of Pine Grove vs. Talcott*, 19 *Wall.*, 666.

One thing is clear, the rate of taxation prescribed by the 19th section is binding until it is repealed, and if it fails as a contract, it is by no means certain, the Legislature would not have passed the entire Act as it is, relying upon the good faith of the State not to repeal the qualified exemption granted under such circumstances. And so with the voters within the districts annexed. Whether it was a contract or a mere privilege repealable in the discretion of the law-making power was fully discussed, and the opinions of eminent counsel in regard thereto were published before the vote on the question of "extension" was taken; and for all we know to the contrary, the voters within the districts to be annexed may also have relied on the good faith of a subsequent Legislature not to revoke a pledge made in so formal and definite a manner. Be this as it may, we cannot say the Legislature would not have passed the "City Extension Act," even though they knew it was within the power of a subsequent Legislature to repeal the qualified exemption granted by the 19th section. For these reasons the order below will be affirmed.

*Order affirmed, and*
*bill dismissed.*

(Decided 23rd November, 1888.)

BRYAN, J., filed the following concurring opinion:

I think that the Act of the Legislature extending the limits of the City of Baltimore is constitutional and valid. But in my opinion, it would have been unconstitutional, unless it had required the consent of a majority of the legal voters residing in the territory annexed to the city. As Baltimore City was entirely surrounded by the county, its limits could not have been extended without changing the lines of the county. Now, the first section of the thirteenth Article of the Constitution, after stating that the General Assembly may provide by law for organizing new counties, locating and removing county seats, and changing county lines, uses this language: "nor shall the lines of any county be changed without the consent of a majority of the legal voters residing within the district which, under said proposed change, would form a part of a county different from that to which it belonged prior to said change." This section was intended to give constitutional security to local government. The people were not to be denied the privilege of living under county governments of their own choice. No portion of the population of a county were to be excluded from it, and transferred to another, unless their consent was given at the polls, through a majority of the voters of the district affected. The right of local government would be violated as much by transferring them to the City of Baltimore without their consent, as it would be by annexing their territory to another county. The essential right of choice is denied in each case. Nor can we say, that in construing this section the City of Baltimore is not to be considered and treated as a county. It is a county in all legal and political respects. It has its own Courts, its own representation in the Legislature, and its own local government. It is a distinct political sub-division of the State; and so

are the counties, and nothing more. It is so completely recognized by the law as a county in everything but the name, that it is declared by the Code, as one of the rules of interpretation of statutes, that "the word county shall be construed to include the City of Baltimore, unless such construction would be unreasonable."

(Filed 23rd November, 1888.)

ALVEY, C. J., filed the following opinion :

I do not desire to be understood as dissenting from the order appealed from, refusing the injunction on the bill in this case. But I must dissent from the opinion of the majority of this Court, according to which that order is affirmed. I dissent from the opinion because the practical effect of it is to nullify that most valuable guaranty, found in the Constitution of the State, designed to restrain the power of unequal and arbitrary taxation.

The question, whether it be competent to the Legislature to authorize the extension of the limits of the City of Baltimore, by annexing thereto certain districts of an adjoining county, in the manner provided in sections 1, 2, 3, 4, 5, 6 and 7, of the Act of 1888, ch. 98, I think may be answered in the affirmative. The City of Baltimore is one of the political territorial divisions of the State, and. I can perceive no substantial objection to construing the appellative *city* as synonymous with that of county ; and I think such construction, while it is not according to the literal reading of Art. 13, sec. 1, of the Constitution, is according to the spirit, and the general object and purpose of the constitutional provision. The Act provides for taking the sense of the people, as it should be expressed by a majority of the legal and qualified voters in the districts to be annexed, as required by

the Constitution; and therefore the people of the district annexed to the city can have no good cause to complain of the annexation, the majority of the voters therein having so elected. Indeed, the popular election was an indispensable condition; as the Constitution expressly provides, that the lines of no county "shall be changed, without the consent of a majority of the legal voters residing within the district which, under said proposed change, would form a part of a county different from that to which it belonged prior to said change." It would be difficult to suggest a reason why popular consent should be required as a condition of severance for annexation to another county, but not for annexation to the city. Such a distinction, I am sure, was never contemplated.

But it is the 19th section of the Act of 1888, ch. 98, providing for the extension of "the limits of Baltimore City, by including therein parts of Baltimore County," that gives rise to the question upon which I particularly dissent from the opinion of the majority of the Court. By that section it is provided, that, prior to the year 1900, the *rate* of taxation in the annexed district or districts shall not exceed the *present* rate of taxation of Baltimore County; and that, until the year 1900, there shall not be, for the purposes of city taxation, *any increase in the present assessment* of the property now assessed, nor of the property not now assessed, but which may be liable to assessment before the year 1900. It is conceded that the present rate of taxation of Baltimore County is but sixty cents in the $100, while in the City of Baltimore, as bounded before the extension, the rate of taxation is about one dollar and ninety cents in the $100, or more than three times the amount of the rate in Baltimore County. It is further provided, by this section, that, until the year 1900, the City of Baltimore shall expend within the

annexed territory "an amount *at least equal* to the amount of revenue derived from taxation on the basis therein set forth from said territory, in affording to the residents within said territory the rights and privileges accorded to and enjoyed by the residents within what are the present limits of said city; but nothing in this Act shall be so construed as to *require* the expenditure by said city of any greater sum," &c.

On the part of the plaintiff, the appellant on this appeal, it is alleged and insisted that the provisions of this 19th section of the Annexation Act are grossly violative of both the letter and spirit of Article 15 of the Declaration of Rights of this State, which declares, "that the levying of taxes by the poll is grievous and oppressive, and *ought* to be prohibited; that paupers ought not to be assessed for the support of the government; but every person in the State, or person holding property therein, *ought* to contribute his proportion of public taxes for the support of the government, *according to his actual worth in real or personal property*; yet, fines, duties or taxes may properly and justly be imposed or laid, with a political view for the good government and benefit of the community." It is insisted by the plaintiff that not only the 19th section of the Act, but the whole statute, is rendered null and void, because of the obnoxious provisions contained in the 19th section before recited. This contention is strongly controverted by the defendants; and the leading question on this appeal is that in respect to the proper construction and application of the 15th Article of the Declaration of Rights.

This 15th Article, as it now stands in the present Declaration of Rights, formed the 13th Article of the Declaration of Rights of 1776, and it has been incorporated in every Declaration of Rights adopted in the State since that time. And it has been repeatedly

held, that the Declaration of Rights is to be taken as part of the Constitution of the State; that it declares not only doctrines relating to and confirmatory of personal rights, but fundamental principles that are to be regarded in administering the powers of government. *Crane vs. Meginnis*, 1 *G. & J.*, 463; *The Regents, &c. vs. Williams*, 9 *G. & J.*, 411, 412; *Anderson vs. Baker*, 23 *Md.*, 571, 573, 588.

The form of expression employed in the various Articles of the Declaration of Rights, such as we have in the 15th Article, imports a positive limitation of power. The verbal phrase *ought* means, or necessarily implies, obligation or duty; and is equally imperative as would be the word *shall*, if used in the same connection. This is clearly shown by express decisions. In *Crane vs. Meginnis, supra,* where the 6th Article of the Declaration of Rights, which declares "that the legislative, executive and judicial powers of government *ought* to be forever separate and distinct from each other," was considered, it was held, that the terms of the Article operated as a positive limitation of power; and because the provision of one of the sections of a statute was adjudged to be an attempted exercise of judicial power by the Legislature, that section was declared to be absolutely void, though the rest of the statute was held to be valid. And so in the important and leading case of *The Regents vs. Williams, supra,* involving the consideration of fundamental questions, the Court laid it down with emphasis, that "the division of the powers of the government proclaimed by the 6th Article of the Bill of Rights, and the 21st Article of the same instrument, declaring, 'that no freeman *ought* to be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the

judgment of his peers or by the law of the land,' were intended *as restraints* upon the legislative power, by means of the Courts of justice, in which the laws were to be administered, and where all would be entitled to be heard, and have an opportunity afforded them of asserting and defending their rights against any attempted invasion."

In the argument at bar, as I understand it, it was conceded by counsel for the appellees, that the 15th Article of the Declaration of Rights does operate as a restraint or limitation upon the power of the Legislature in imposing general taxes upon the State at large, for State purposes, and that such taxes must be equal and uniform. This concession might well be made; for it has been the established and received opinion, among the ablest of the profession, since the adoption of the Declaration of Rights, that every person ought to contribute to the support of government according to his actual worth, and that this was a fundamental principle embodied in the organic law, and not discretionary with the Legislature, but a binding rule, from which no lawful departure could be made by legislative design. *The Tax Cases*, 12 *G. & J.*, 134, 145. And the Courts, in many cases, have expressly held, and in other cases assumed it to be unquestionable, that the provision of the Declaration of Rights, embodied in the 15th Article, is a positive limitation upon the legislative power of taxation, requiring all general taxes to be equal and uniform, as near as possible. This is shown in the clearest manner, and beyond the cavil of a doubt, in the cases of *Waters vs. The State*, 1 *Gill*, 303, 308; *Mayor & C. C. of Balto. vs. Balto. & Ohio Railroad Co.*, 6 *Gill*, 288; *State vs. Sterling*, 20 *Md.*, 502, 516; *Tyson vs. State*, 28 *Md.*, 577, 586, 587; *State vs. Cumberland & Penn. Railroad Co.*, 40 *Md.*, 28, 50; *State vs. P., W. & B. Railroad Co.*, 45 *Md.*, 361.

But while thus conceding the restrictive force of the Article, as applied to the levy of general taxes for State purposes, it is denied to have any application to, or restraining effect upon, the power of the Legislature, in authorizing the levy of general taxes for county or municipal purposes. To this proposition I cannot assent. There is nothing in the terms of the Article of the Declaration of Rights to indicate such distinction, nor does the reason or principle upon which the Article is founded justify such discrimination. It is matter of common knowledge that by far the heaviest and most oppressive taxation is that levied for municipal and county purposes; and it is in that taxation that the greatest abuses most frequently occur. If the object of the provision of the Declaration of Rights was to restrain the possible abuse of power, why should it be confined to the levy of taxes for the State at large? If the principle be sound and valuable as a means of protection to the people, why should it not equally apply to the general taxes levied for municipal and county purposes, as to those levied for the State at large? I cannot perceive the reason for any such distinction; and holding the opinion that I do I cannot assent to any such construction as that contended for by the appellees, merely to meet the necessities of a particular case. The success of free institutions depends upon a strict adherence to the fundamental law, as we have it in our written constitutions and forms of government; and we should never depart from it upon considerations of any mere expediency or convenience of particular occasions. As was said by an able and distinguished jurist, (the late Judge BRONSON,) "There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power,—some evil to be avoided, or some good to be attained, by pushing the powers of the government be-

Daly *vs.* Morgan, *et al.*

yond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule," (said that learned Judge,) "has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the Legislature or the Courts undertake to cure the supposed defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the Legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them." *Oakley vs. Aspinwall*, 3 *Comst.*, 547, 568. Of the truth of these observations no one will doubt, who is at all familiar with the constitutional history of the country.

That the framers of the Declaration of Rights, by incorporating the 15th Article, intended to assert, and to give force and effect to, a just and valuable political maxim, founded in reason and the fundamental principles of the social compact, can admit of no reasonable doubt; and it is equally clear that they intended that this just and salutary principle should be observed in the same large and beneficial sense in which it was maintained by writers of authority upon natural and political law. And as showing what was in the minds of the framers of the Declaration of Rights, it will not be amiss to refer to some few passages in the works of such writers of repute.

In vol. 2, pt. 3, c. 5, sec. 14, of the treatise of *Burlamaqui* on the *Principles of Natural and Political Law*, the translation of which was first published in Eng-

land in 1748, the author, in treating of the rules upon which taxes should be imposed, says: "The subjects must be *equally* charged, that they may have no just reason of complaint. A burden, equally supported by all, is lighter to every individual; but, if a considerable number be released or excused, it becomes much more heavy and insupportable to the rest. As every subject *equally* enjoys the protection of the government, and the safety which it procures, it is just that they should all contribute to its support in *proper equality.*"

In *Rutherforth's Institutes of Natural Law,* bk. 2, ch. 3, *page* 272, (published in 1754–1756,) it is laid down as a fixed principle, that it is the business of the Legislature "to consider and direct what part of each man's property it is worth to have the rest secured to him. The security which he has in view, depends upon the preservation and welfare of the public. And for this reason the legislative power, in settling what each person is to pay, should consider how much of each person's property it would be worth to him to preserve the State and advance its welfare; because, whatever appears to the common understanding to be necessary for these purposes, is what every person who belongs to the State, is naturally presumed to be willing to part with. Upon this account the burden of those payments which are called taxes, or duties and customs upon goods, both moveable and immoveable, *ought to be proportioned,* as near as may be, *to the value of each person's property;* because the more a man's property is worth, the more he is naturally willing to pay for the security of it."

And so *Vattel* in his treatise on the *Law of Nations,* bk. 1, ch. 20, sec. 240, *page* 111, (first published in English in 1760,) lays it down as an axiom in political administration, that taxes "ought to be regulated in such a manner, that all the citizens may pay their

quota *in proportion* to their abilities, and the advantages they reap from the society. All the members of civil society being *equally* obliged to contribute, *according to their abilities*, to its advantage and safety, they cannot refuse to furnish the subsidies necessary to its preservation, when they are demanded by lawful authority." And *Adam Smith*, in his work on the *Wealth of Nations*, (published in 1776,) in treating of the principles of taxation, (*bk.* 5, *ch.* 2, *pt.* 2, *page* 651,) says, "The subjects of every State ought to contribute towards the support of government, as nearly as possible in proportion to their respective abilities; that is, in proportion to the revenue which they respectively enjoy under the protection of the State. The expense of government to the individuals of a great nation, is like the expense of management to the joint tenants of a great estate, who are all obliged to contribute in proportion to their respective interests in the estate. In the observation or neglect of this *maxim* consists, what is called, the equality or inequality of taxation." It was with reference to this well established political maxim and to give it force that the 15th Article of the Declaration of Rights was incorporated in that instrument.

Now, all taxes are imposed by the authority of the State; and those imposed for county or municipal purposes are levied under authority *delegated* by the State, and are in fact for State purposes; for the city of Baltimore and the several counties are but political territorial divisions of the State, maintaining separate organizations for and as subordinate parts of the State government. Hence, where a State clothed a city with authority to tax persons and property within its limits, and that city passed ordinances assessing a tax upon bonds of the city, and thus diminishing the amount of interest which it had agreed to pay, the Supreme

Court of the United States held such ordinances to be laws impairing the obligation of contracts, within that provision of the Constitution of the United States which prohibits any State from passing any law impairing the obligation of contracts, for the reason "that the city charter gave limited legislative power to the City Council, and, when the ordinances were passed under the supposed authority of the legislative Act, their provisions became the law of the State." *Murray vs. Charleston*, 96 *U. S.*, 432, 440; *N. O. Waterworks vs. La. Sugar Co.*, 125 *U. S.*, 31. The same principle was involved, and was fully recognized by this Court, and the Supreme Court of the United States, in the case of *The State vs. Balto. & Ohio R. R. Co.*, 12 *G. & J.*, 399, *and* 3 *How.*, 534. Therefore, upon principle and reason, there can be no ground for the distinction, and no such restricted application of the 15th Article of the Declaration of Rights, as that contended for by the appellees. And in support of this conclusion the authorities are exceedingly clear and unqualified.

In the Constitutions of most of the States of the Union, there is found a limitation upon the power of taxation similar, though expressed in varied terms, to that embodied in the 15th Article of our Declaration of Rights. The same limitation is found in the Constitution of the United States, (Art. 1, sec. 8,) in respect to the power of Congress to levy duties, imposts and excise taxes; it being declared that such taxes "shall be uniform throughout the United States." In some of the State Constitutions the limitation upon the power is qualified or restricted in its application, as in the Constitution of Virginia, (before that of 1869,) West Virginia, Louisiana, Texas, California, and some others. In the Constitutions of those States the provision is, that "taxation shall be equal and uniform *throughout the State;*" and where such is the limitation,

it can only apply to general State taxes, and not to county and municipal taxes, where different rates may be required for the different counties and municipalities of the State. There are other States, as in Pennsylvania, where the limitation is that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." *Penn. Const. of* 1873. But wherever the limitation is so phrased, as in our Declaration of Rights, as to be capable of being fairly applied to any and all general or ordinary taxes assessed for the support of State or municipal government, the Courts of the highest authority, and the most approved of our text writers, hold and maintain that the limitation or restriction operates as well upon the power to levy taxes for county or municipal purposes, as upon that to levy taxes for general State purposes.

In the case of *Gilman vs. City of Sheboygan*, 2 *Black*, 510, the Supreme Court of the United States, following with entire approval the repeated decisions of the Supreme Courts of Ohio and Wisconsin, held, that the levying of taxes by a public corporation, the city of Sheboygan, under the authority of a law of the State, to pay the debts of the city, was the exercise of the taxing power, just as much as the taxation of the citizens directly, for the support of the State Government. And as the Constitution of Wisconsin required the rate of taxation to be *equal and uniform*, it further held, that all kinds of property, not lawfully exempted, should be taxed alike, by the same standard of valuation, equally with other taxable property, and *co-extensively with the territory to which it applied.* And because by the statute authorizing the levy there was a discrimination made in favor of one species of property, the statute, and the levy under it, were declared to be in conflict with the Constitution of the State,

and therefore void. The principle was re-asserted, to its full extent, by the same learned Court, in the case of *Township of Pine Grove vs. Talcott,* 19 *Wall.,* 666, 675, the case arising under the Constitution of the State of Michigan. In that case, the Court, in observing upon the provision of the Constitution requiring uniformity in the levying of taxes, said that "the object of the provision was to prevent unjust discrimination. It prevents property from being classified and taxed as classed, by different rules. All kinds of property must be taxed uniformly, or be entirely exempt. The uniformity must be co-extensive with the territory to which the tax applies. If a State tax, it must be uniform all over the State. If a county or city tax, it must be uniform throughout such county or city." And in still more recent cases, those of *Cummings vs. Nat. Bank,* 101 *U. S.,* 153, and *Hagar vs. Reclamation District, No.* 108, 111 *U. S.,* 701, 709, the same principle is stated, with the concurrence of the entire Court.

The text writers are equally explicit. In 2 *Dillon on Municipal Corporations, sec.* 740, (3*d Ed.*) it is laid down as established law upon this subject, that "*In the absence* of special constitutional restriction, the Legislature may *confer the taxing power upon municipalities in such measure as it deems expedient;* in other words, with such limitations as it sees fit, as to the rate of taxation, the purposes for which it is authorized, and the objects (that is, the property) which shall be subject to taxation; but it cannot, of course, confer any *greater power than the State itself possesses,* and must observe the restrictions and limitations of the organic law."

In *Judge Cooley's work on Constitutional Limitations, page* 612–13, the author says, what must be accepted as a plain political truth, that "it is of the very essence of taxation that it be levied with *equality and uniform-*

*ity*, and to this end, that there should be some system of apportionment. Where the burden is common, there should be common contribution to discharge it." And, in another paragraph on the next page, he says: " A State tax is to be apportioned through the State, a county tax through the county, a city tax through the city; while in the case of *local improvements*, benefiting in a special and peculiar manner some portion of the State, or of a county or city, it is competent to arrange a special taxing district, within which the expense shall be apportioned." And in the same author's work on *Taxation, page* 134, (*2d Ed.*) in commenting upon the restrictive provisions of State Constitutions, such as the 15th Article of our Declaration of Rights, he says, " as to these provisions it has been decided that they were manifestly inserted in the fundamental law for the purpose of insuring equality in the levy and collection of the taxes to support the government, whether levied for State, county or municipal purposes. The design was to impose an equal proportion of these burthens upon all persons within the limits of the district or body imposing them. Under these provisions the Legislature has no power to exempt or release a person or community of persons from their proportionate share of these burthens."

And so *Burroughs*, in his very excellent work *on Taxation, at page* 380, *ch.* 19, *sec.* 130, states the result of the decisions, and the general principle, very clearly. He says: " The provisions in State Constitutions limiting the power of taxation, apply to counties, cities and other sub-divisions of the State, to which the power to tax is delegated. The provisions in the Constitutions of the State, requiring taxation to be equal and uniform, apply to all its sub-divisions, and a tax levied by a city in a State having such a provision, solely on the real estate of the city, is in conflict with

486 MARYLAND REPORTS.

Daly *vs.* Morgan, *et al.*

such provision, and void. It is a general rule that the limitations in the State Constitutions, as to the subjects of taxation and the mode of taxation, apply as well to taxes levied by sub-divisions of the State, as to those levied by the Legislature." To these citations, many others could be added to the same effect; but I deem it unnecessary to make further quotation.

The broad contention of the appellees, if maintainable, goes to the full extent (and it was so conceded by them in the argument) of allowing the Legislature complete and unrestricted control over the subject of taxation for county and city purposes: That any discrimination it may think proper to make, as to what shall be taxed, or what shall not be taxed, or as to the rates of assessments, is entirely within its discretion. And this would seem logically to follow, if it be true that the 15th Article of the Declaration of Rights does not operate as a restraint upon the exercise of such power. I cannot, however, for a moment entertain the opinion that such unrestricted power rests with the Legislature. But on the contrary, in my judgment, when it is declared that each person, holding property in this State, " ought to contribute his proportion of public taxes for the support of the government, *according to his actual worth in real or personal property,*" it is meant that his contribution should be made according to the value of his property, at a rate uniform with that imposed upon all other property within the territorial limits of the State, county, or city imposing the tax.

In the argument at bar much reliance was placed upon the cases of *U. S. vs. Memphis*, 97 *U. S.*, 284, and *Louisiana vs. Pilsbury*, 105 *U. S.*, 295, as tending to support the contention of the appellees. But the slightest examination of those cases will show that they have no application to this case whatever. In

the first of those cases, the city had entered into a contract for the paving of certain streets; and after most of the work was done, the Legislature, by an Act, authorized the annexation of certain contiguous territory, but in which annexed territory *none of the work was done.* The Legislature, by subsequent Act passed in 1869, declared that the people residing within the limits of the annexed territory should not be taxed to pay any part of the debt contracted to be paid for the paving, prior to the passage of the Act authorizing the annexation. This was simply the case of a *local improvement* for which those specially benefited could be required to pay; and that was what the Supreme Court held. The Court, in its opinion, said: "Surely the Legislature is not prohibited from declaring what districts shall be liable to taxation *for local uses,* and the Act of 1869 *was but an exertion of this power.*"

In the second of the cases just mentioned, the tax was imposed for municipal purposes, but it was under a Constitution which provided for equality and uniformity of taxation *throughout the State,* which, in the nature of things, could not be applied to the varied rates of taxation required to meet the wants of the many counties and municipalities of the State. The Supreme Court of the United States, following the decision of the Supreme Court of the State, held, that the Article in the Constitution, *by its terms,* applied to State, and not to municipal taxes. This surely can have no application to a case arising under the provision of our Declaration of Rights.

But, upon the assumption that the provision in the Declaration of Rights does apply to county and municipal taxes, it is insisted, and this seems to be the position most relied on by the appellees, that it is competent to the Legislature to make special taxing districts, even for the levying of general taxes, within

the limits and jurisdiction of any county or city of the State, and as many of them as the Legislature may deem proper, and for any reason it may deem proper, and to prescribe a special and different rate of taxation in such districts from that imposed upon the people of the other parts of the county or city; and that the Legislature, in the enactment of the 19th section of the Act of 1888, ch. 98, was simply in the exercise of that lawful power.

Can this contention be sustained upon any principle of established law? I am clearly of opinion it cannot. The great object and purpose of the Act of 1888, ch. 98, is to effect an extension of the city limits, and to incorporate into the city, as part and parcel thereof, the designated parts of Baltimore County, containing a population of forty or fifty thousand people. All the jurisdiction and powers of the city corporation, as a municipal organization, are extended over the inhabitants and territory of the annexed district. Those inhabitants become corporators in common with all the rest of the inhabitants of the city. They are entitled to share equally with the other portions of the population, in all the rights, privileges, property and improvements of the city, and are liable in common with the rest of the population for the debts and obligations of the city, and for the expenses of the city government. They have a right to equal representation in the City Council, and thus to participate in the making the laws and ordinances for the government of the whole city, and in imposing taxes and raising revenue for all city purposes. It is not pretended that there is any separate municipal organization for the annexed district, or that it has any peculiar functions to perform, separate and distinct from those of the city at large, for which *local taxes* might be levied. The district has been annexed by popular

election, and has become incorporated in the city as an integral part thereof; and there is an entire absence of any constitutional warrant or authority for detaching the district from Baltimore County and annexing it to the city, except upon terms of perfect equality with the rest of the population, both as to rights under and duties to the municipal government. The taxes authorized to be levied on this annexed district are not to be levied for any *special local* purpose or objects; but they are to be levied for the city at large, as part of its common revenue for general city purposes. Levies will be made upon that district as upon all other parts of the city, for revenue to defray the expenses of the municipal government—such as for the support of the police of the city, the fire department, the school system, for the expenses of the Courts, the elections, the jail, lighting the streets, for the support of the institutions for the relief of the poor, and hundreds of other objects provided for by *general levies* upon the entire city. When the taxes upon these general levies are realized, or as they are realized, they form a common city fund or funds, for the objects contemplated; and it does not seem to be possible to make any such apportionment and distribution of those funds, as would appear to be the design of the 19th section of the Extension Act. Indeed, the entire scheme of apportionment under the Act would seem to be utterly impracticable. But, at any rate, even upon the theory of the appellees, the contributions made by the tax-payers of the annexed territory, to the support of objects essential to their government, and from which they will derive full and equal benefits with all the other tax-payers of the city, would be greatly less than the rate of contribution made by such other tax-payers; and hence there would be no just and equal contribution as contemplated by the

15th Article of the Declaration of Rights. It is very clear that the extension of the city limits was not effected upon the footing of a contract; nor was it effected by the mere exercise of legislative power, irrespective of constitutional provision. It was under the authority of the Constitution that the city limits were extended, and it could only be done in the manner as provided by the Constitution, Article 13, sec. 1. By that provision of the Constitution, no terms or conditions are contemplated for the changing of county or city lines, except those therein specified. Any others are without constitutional warrant; and clearly the Legislature has no power over the subject except that derived from the Constitution.

If the statute had simply provided for local assessments for local improvements, the question would be quite different from what it is. In such case, while the assessment is in one sense a tax, it is essentially different in its nature, and is levied upon a different principle from the levies made for general governmental purposes. The distinction is fully recognized in all the cases, and in none more fully than in our own. *Mayor & C. C. of Balto. vs. Greenmount Cemetery*, 7 *Md.*, 517; *Brooks vs. Mayor, &c., of Balto.*, 48 *Md.*, 265. The general levy of taxes, says Judge COOLEY, in his *work on Taxation, page* 416, "is understood to exact contributions in return for the general benefits of the government, and it promises nothing to the persons taxed, beyond what may be anticipated from an administration of the laws for individual protection, and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited in the enhancement of the value of property, peculiarly situated as regards a contemplated expenditure of public funds; and in addition to the general levy, they demand

Daly vs. Morgan, et al.

that special contributions in consideration of the special benefit, shall be made by persons receiving it." As familiar objects of such special assessments, may be mentioned the making or improving of streets and highways, the construction of sewers or culverts, the drainage of swamp lands, the raising of levees, etc. *Mayor, &c., of Balto. vs. Moore*, 6 *H. & J.*, 375; *Mayor, &c., of Balto. vs. Howard*, 6 *H. & J.*, 383; *Hagar vs. Reclamation District, No.* 108, 111 *U. S.*, 701, 704. As said by Mr. Justice FIELD, in delivering the opinion of the Court in the case last cited, "The rule of equality and uniformity, prescribed in cases of taxation for State and county purposes, does not require that all property, or all persons in a county or district, shall be taxed for *local purposes.* Such an application of the rule would often produce the very inequality it was designed to prevent. As was said in *Louisiana vs. Pilsbury*, 105 *U. S.*, 278, 295, there would often be manifest injustice in subjecting the whole property of a city, and the same may be said of the whole property of any district, to taxation for an improvement of a local character. The rule, that he who reaps the benefit should bear the burden, must in such cases be applied." Here, the taxes provided for by the 19th section of the Extension Act, are not to be assessed for local improvements, nor have they any of the characteristics of a local improvement tax; but, as I have shown, they are general taxes to be levied in the ordinary way for support of the municipal government, the only thing distinguishing them from such taxes levied upon all other parts of the city being that they are to be levied at a different and a much less rate.

But the question remains, is the whole Act a nullity and without effect, because the 19th section is unconstitutional and void? The Act, without the 19th section, is complete, and makes full provision for all

the conditions required for extending the city limits, under the Constitution. There is nothing essential in that section; and its provisions being unconstitutional, they may well be rejected without in any manner impairing the other provisions of the Act. The Legislature, according to my judgment, had no power to prescribe any such terms as are therein contained; and the voters, in the acceptance of the Act, must be taken to have acted upon their own judgments, and at their own peril, as to what was or was not constitutional in the Act. It may be true, that the provisions of the 19th section were inserted to overcome opposition to, and to furnish an inducement for, the adoption of the Act by the people. But all the provisions of the Act were before the voters for their consideration and scrutiny; and if some of them have voted upon an erroneous assumption as to the effect or validity of some of the provisions of the Act, and especially in respect to provisions quite apart from its main object and purposes, I do not think that the whole Act must therefore fail of operation and effect. If this were an ordinary Act of the Legislature, not being in any manner dependent upon popular vote for its effect, I think there could be no question but that, upon the rejection of the 19th section, the other provisions of the Act would, upon settled principles, be allowed their full force and operation; and I see nothing in the nature of the Act to make it an exception to the general rule.

With respect to the further question made, whether the 19th section of the Extension Act is not void under the Fourteenth Amendment to the Constitution of the United States, because of the grossly excessive burden imposed upon one portion of the tax-payers of the city to the exoneration or excuse of another portion, in the raising of revenue for common benefit, I offer no opinion. With my views as to the effect of the 15th Article

Daly *vs.* Morgan, *et al.*

of the Declaration of Rights, it is quite unnecessary that I should enter into the discussion of the question as presented under the Federal Constitution.   Moreover, unless the appellant could successfully maintain that the unconstitutionality of the 19th section of the Extension Act vitiated the whole statute, he is not in a position to take advantage of the invalidity of the 19th section alone.   But, as bearing upon the question as presented under the Fourteenth Amendment, I may refer to the very elaborate and able opinions of Mr. Justice FIELD and Judge SAWYER, in the case of *County of San Mateo vs. Southern Pac. R. Co.*, 8 *Sawy.*, 238, *S. C.*, 13 *Fed. Rep.*, 722; and in *The Santa Clara Railroad Tax Case*, 9 *Sawy.*, 165, 210, *S. C.*, 18 *Fed. Rep.*, 385, and *S. C. on Error in the Supreme Court of the United States*, 118 *U. S.*, 394, 396 *and* 410.   See also *Spencer vs. Merchant*, 125 *U. S.*, 345, 352.

It results from the views that I have expressed in regard to the Act of 1888, and the unconstitutionality of the 19th section thereof, that, in my judgment, the order refusing the injunction ought to be affirmed.

(Filed 23d November, 1888.)