JAMES F. THRIFT, Comptroller,

*vs.*

PHILIP D. LAIRD.

*Constitutional law: limit of salaries; section 1 of Article 15;
applies only to fee officers. Baltimore City: power of Leg-
islature over—; Public Service Commission; part of
salary to be paid by Baltimore City; —as to "city
employees." Article 35 of the Bill of Rights:
"holding more than one office." Stat-
utes: titles of. Constitution, Arti-
cle 3, section 29.*

Section 1 of Article 15 of the Constitution, limiting the
amount of compensation public officers may receive, does not
prohibit the General Assembly from creating salaried officers
with pay in excess of $3,000.                          p. 63

This section applies only to that class of officers whose pay
or compensation is derived from fees which they are entitled by
law to receive for the performance of their official duties.   p. 63

The power of the Legislature over the City of Baltimore is
not absolute and unlimited, but while it must deal with the city
in subordination to the restraints and limitations of the Con-
stitution, the Legislature possesses wide powers of control and
legislation over it.                          p. 67

The Legislature has the right, by law, to impose upon the city a portion of the burden of the expense of supporting the Public Service Commission, a large part of whose work is mainly for the benefit of the city. p. 67.

The Public Service Commission Act, Chapter 180 of the Acts of 1910, in fixing the salaries of the commissioners at $3,000 to be paid by the State, and an additional $3,000 to be paid by the City of Baltimore, as to city employees, does not violate Article 35 of the Declaration of Rights, declaring that no person shall hold at the same time more than one office of profit or trust. p. 69

The Public Service Commission Act, Chapter 180 of the Acts of 1910, providing for an additional payment to be made to the Commissioners as employees of the city, is not invalid because of any defect in title, under section 29 of Article 3 of the Constitution. pp. 69-70

While that section is mandatory, it is to be liberally construed. p. 70

While under it the title must indicate the subject, it need not give an abstract of the Act, nor need it mention the means and methods by which the general purpose is to be accomplished.

p. 70

Every presumption favors the validity of a statute; it can not be stricken down as void, unless it plainly contravenes some provision of the Constitution; a reasonable doubt in its favor is enough to sustain it. p. 70

The party assailing a statute must point out the special provision of the Constitution to which it is obnoxious. p. 70

Plenary power is in the Legislature for all purposes of civil government, is the rule. p. 70

In general, except where the State or Federal Constitution, has imposed limits upon the power of the Legislature, it must be considered as practically unlimited. p. 70

A somewhat different rule prevails, however, in Maryland.

p. 70

*Decided January 14th, 1915.*

Appeal from the Superior Court of Baltimore City. (DOB-
LER, J.)

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*S. S. Field,* *City Solicitor,* for the appellant.

*W. Cabell Bruce, General Counsel for the Public Service
Commission* (with whom was *Albert C. Ritchie, Assistant
Counsel,* on the brief), for the appellee.

By leave of Court, *Edward M. Hammond* and *Wm. W.
Beck* filed a brief on behalf of the State Tax Commisisoners
of Maryland.

BURKE, J., delivered the opinion of the Court.

A Public Service Commission was created and established
by the Act of 1910, Chapter 180, p. 338. It is known as the
"Public Service Commission Law." The title of the Act is as
follows: "An Act to create and establish a. Public Service
Commission, and prescribing its powers and duties, and to
provide for the regulation and control of Public Service
Corporations and Public Utilities, and making appropriations
therefor." The second section of the Act provided for the
appointment, qualification, tenure of office, and salaries of
the members of the Commission, which was to consist of
three persons. This section further declared that: "The
salary of each commissioner shall be three thousand dollars
($3,000.00) per annum, payable out of the State Treasury
of the State of Maryland; and in addition to said sum of
three thousand dollars per annum, the chairman of said
Commission shall also receive the sum of three thousand dol-
lare ($3,000.00) per annum, which shall be paid out of its
funds by the Mayor and City Council of Baltimore to said
chairman of said Commission as an employee of said munic-
ipal corporation; and each of the other two commissioners
shall receive, in addition to said three thousand dollars per

annum aforesaid, the sum of two thousand dollars ($2,000) per annum, which shall be paid out of its funds by the Mayor and City Council of Baltimore to each of said other two commissioners, as employees of said municipal corporation."

The Act made it the duty of the .Governor, upon the recommendation of the Commission, to appoint an attorney at law of the State of Maryland to be and act as the general counsel to the Commission at an annual salary of three thousand dollars, and it was further provided by section 2, that "the general counsel shall also receive, as additional compensation, the sum of eighteen hundred dollars per annum, which shall be paid out of its funds by the Mayor and City Council of Baltimore to said general counsel, as an employee of said municipal corporation." The Act imposed the duty upon the Mayor and City Council of Baltimore and directed and required it "to pay out of its funds the salaries and compensations provided and prescribed by this Act to be paid by it, and it shall pay said salaries and compensations to the said several commissioners and general counsel of said Commission in monthly instalments, payable at the same time and in the same manner in all respects as the salary and compensation of the Mayor of said municipal corporation is paid to him by it."

By the general ordinance of estimates for the year 1914. which was approved by the Mayor on the 15th of December, 1913, the Mayor and City Council made appropriation for the payment of the salaries and compensations provided and prescribed by the Act in this form: "The Public Service Commission (subject to the opinion of the city solicitor as to the legality of the law), eight thousand eight hundred dollars ($8,800.00)." The Mayor and City Council paid in bimonthly installments of $125.00 to the chairman, and $83.33 to each of the other two members of the Commission, and $75.00 to the general counsel, until the 29th day of May, 1914, the several respective sums made payable by the City

under section 2 of the Act. On that date the pay-roll of the
Commission was presented to the comptroller, James F.
Thrift, for his warrant for the payment by the city register
of Baltimore City, at the same time and in the same man-
ner as the salary of the Mayor is paid, for the respective
sums payable on the first day of June, 1914, for the period
between the 15th day of May, 1914, and the 1st day of June,
1914. The comptroller refused to give his warrant, and
returned the pay-roll to the Commission, and stated that he
did so upon the advice of the city solicitor, who had pre-
viously advised the Mayor that the provisions of the Public
Service Commission Law imposing a part of the salary of
members of the Commission upon the Mayor and City Coun-
cil of Baltimore were null and void, and should not be
obeyed by the comptroller or any other official of the munic-
ipality.

The appellee was then the chairman of the Public Service
Commission, and there was due him by the Mayor and City
Council of Baltimore under the provisions of the Act the
sum of $125.00, and if the provisions to which reference
has been made, and which imposed upon the City a portion
of the salaries of the members of the Commission and its
general counsel are valid, it was the clear and imperative
duty of the City to have paid the appellee the sum due. Upon
the refusal of the comptroller to issue his warrant for the
payment of said sum, the appellee, on the first day of July,
1914, instituted an action of mandamus in the Superior
Court of Baltimore City against the comptroller in which he
prayed that James F. Thrift, the comptroller of Baltimore
City, be commanded "to draw his warrant in the usual man-
ner upon the city register for the payment to your petitioner
out of the treasury of the Mayor and City Council of Balti-
more of the bi-monthly instalment of salary which became
due to him as aforesaid on the first day of June in the year
1914, for the period between the fifteenth day of May, in the

year 1914, and the first day of June, in the year 1914; that is to say, the sum of $125.00."

The comptroller answered the petition, and set out fully the reasons why the order should not be granted. Briefly, but substantially stated, these reasons are that those provisions of the Act which imposed the obligation upon the Mayor and City Council to pay the respective sums therein specified were null and void: First, because they violated section 1, Article 15 of the Constitution of Maryland; secondly, because the Act of 1910, Chapter 180, contravenes section 29, Article 3 of the Constitution; thirdly, because the Act is a violation of the Fourteenth Amendment of the Constitution of the United States, in that it attempts to deprive the City of Baltimore, and its tax-payers who furnish its funds, of its property without due process of law; and fourthly, that if the expression in the Act of 1910, Chapter 180, that the chairman of the Public Service Commission should receive $3,000 and each of the other members $2,000 and the general counsel $1,800 per annum, "which shall be paid out of its funds by the Mayor and City Council of Baltimore, as employees of said municipal corporation," were to be construed to make said chairman, members and general counsel city employees, then the provisions would be null and void under Article 35 of the Declaration of Rights.

The appellee demurred to the answer, and the Court, after full argument, sustained the demurrer. The appellant, as stated in the record, "waived leave to amend his answer," and the Court on the 21st day of September, 1914, ordered the writ of mandamus to issue as prayed. From this order the comptroller has prosecuted this appeal.

It is to be observed that the Act allows to each commissioner a salary of $3,000 payable by the State, and in addition the sums specified in the Act payable by the Mayor and City Council of Baltimore. The office of Public Service Commissioner is, therefore, a statutory office with a salary attached in *excess* of $3,000. The main question in the case

is whether it is within the power of the Legislature to attach
to an office of statutory creation a larger salary than $3,000.
This the Legislature has done with respect to this office, and
we will now proceed to consider the reasons urged against
the constitutionality of its act. These reasons will be con-
sidered in the following order: Does the Act violate section 1,
Article 15 of the Constitution? That section is here trans-
cribed:

"Every person holding any office created by, or
existing under the Constitution or laws of the State
(except Justices of the Peace, Constables and Coro-
ners), or holding any appointment under any Court
of this State, whose pay or compensation is derived
from fees or moneys coming into his hands for the
discharge of his official duties, or in any way growing
out of or connected with his office, shall keep a book
in which shall be entered every sum or sums of money
received by him, or on his account, as a payment
or compensation for his performance of official duties,
a copy of which entries in said book, verified by the
oath of the officer by whom it is directed to be kept,
shall be returned yearly to the Comptroller of the
State for his inspection, and that of the General
Assembly of the State, to which the Comptroller shall,
at each regular session thereof, make a report show-
ing what officers have complied with this section;
and each of the said officers, when the amount re-
ceived by him for the year shall exceed the sum which
he is by law entitled to retain as his salary or com-
pensation for the discharge of his duties, and for the
expenses of his office, shall yearly pay over to the
Treasurer of the State, the amount of such excess,
subject to such disposition thereof as the General As-
sembly may direct; if any of such officers shall fail
to comply with the requisitions of this section for
the period of thirty days after the expiration of each
and every year of his office, such officer shall be
deemed to have vacated his office, and the Governor

shall declare the same vacant, and the vacancy therein
shall be filled as in the case of vacancy for any other
cause, and such officer shall be subject to suit by the
State for the amount that ought to be paid into the
treasury; and no person holding any office created by
or existing under this Constitution or laws of the State,
or holding any appointment under any Court in this
State, shall receive more than three thousand dollars
a year as a compensation for the discharge of his
official duties, except in cases specially provided in
this Constitution."

It is to be noted that there is no *express* prohibition in
the section upon the *General Assembly* from allowing a salary
in excess of $3,000. Such a prohibition must be inferred,
if at all, from this language found in the second clause of the
Article: "No person holding any office \* \* \* *shall receive*
more than $3,000." It is not claimed that such a limitation
upon the power of the General Assembly is to be found in
any other provision of the organic law. The whole argument
upon this branch of the case must rest upon *mere* implication
deduced from the language quoted. Such language is not
that usually employed by the Constitution in imposing limita-
tions upon the action of the law-making power. It has im-
posed such restraints in a number of instances. In sections
32, 33, 34, 35, 36, 37, 38 and 40 of Article 3 of the Con-
stitution restraints and limitations are imposed upon the
Legislature, and the language in which these prohibitions is
expressed makes it evident that it was directed against legis-
lative action. Here the prohibition is not against the action
of the *General Assembly* at all, but against a *person* receiving
more than $3,000 per annum from any office, or appointment
created or existing in the mode and manner stated. The
question that naturally suggests itself is: Against what class
of persons is this prohibition directed, and from what source
was it contemplated that the money they received might be
derived? One would naturally suppose that if it had been
the intention of the framers of the Constitution to prohibit

the General Assembly from creating an office with a salary attached exceeding $3,000 they would have done so in plain, direct and simple terms, and not obscured their intention by the use of such language as that to which we have referred. That language undoubtedly does impose a limitation upon the compensation which a certain class of officers or appointees may receive, but it seems to be reasonably clear from the language of *Section* 1, *Article* 15, when considered in the light of its historical genesis and the accepted canons of Constitutional construction, that it does not prohibit, and was never intended to prohibit, the General Assembly from creating salaried officers whose pay should exceed $3,000. The section was intended to apply to that class of officers whose pay or compensation was derived from fees which they were entitled to receive by law for the performance of their official duties. Thus construed the second clause of *Section* 1, *Article* 15, expresses in appropriate terms the intention of its framers.

Prior to the constitution of 1851 practically all officials in the State received their compensation from fees. The fee system resulted in wide-spread abuses, and occasioned general complaint throughout the State. The evils which it introduced were attempted to be remedied by the Convention of 1851. It was provided by *Article* 10, *Section* 1 of that Constitution, that: "Every officer of this State, the Governor excepted, the entire amount of whose pay or compensation received for the discharge of his official duties shall exceed the yearly sum of three thousand dollars, shall keep a book, in which shall be entered every sum or sums of money received by him or on his account as a payment or compensation for his performance of official duties, a copy of which entries in said book, verified by the oath of the officer by whom it is directed to be kept, shall be returned yearly to the treasurer of the State for his inspection and that of the general assembly of Maryland; and each of such officers, when the amount received by him for the year shall exceed the sum of three thousand dollars, shall yearly pay over to the

treasurer the amount of such excess by him received, subject to such disposition thereof as the Legislature may deem just and equitable. And any such officer failing to comply with the said requisition shall be deemed to have vacated his office, and be subject to suit by the State for the amount that ought to have been paid into the treasury."

Following the adoption of the Constitution of 1851 various acts of the General Assembly were passed regulating the fees to be charged by fee officers. They were codified in Article 38 of the Code of 1860, and relate to Clerks of Courts, Register of Wills, Commissioner of the Land Office, Constables, Coroners, Criers, Justices of the Peace, Sheriffs, etc.

These officers were required under the section of the Constitution just quoted to make yearly returns to the Treasurer of the State. It seems clear from the debates in the Convention upon the subject, contained in Vol. 2, that the first section of Article 10 of the Constitution was intended to apply to *fee* officers, and not to *salaried* officers. The intention of the framers of the Constitutional Convention of 1864 upon the subject is more clearly manifested by the debates in that convention.

When the report of the committee on the schedule, which embraced in substance a transcript of *Section* 1, *Article* 10, of the Constitution of 1851, was before the convention for consideration, Mr. Henry Stockbridge moved to strike out from the first line the words, "Every officer of this State," and to substitute in lieu thereof the words, *"Every person holding any office created by or existing under the Constitution or laws of this State."* This amendment was adopted, and the language in which the amendment was proposed appears in *Section* 1, *Article* 12 of the Constitution of 1864, and also in *Section* 1, *Article* 15 of the present Constitution. A motion was made, and failed, to reconsider the vote by which the amendment was adopted. The debate which ensued (Vol. 3, page 1698) makes it plain that the section of the Constitution was intended to apply to *fee offices only.* As the amendment was adopted and was incorporated in the

Constitution, we quote the following short extract from the debates which is sufficient to manifest its object and purpose, and the reason for its adoption:

"Mr. Ridgely: I wish to call the attention of the gentleman from Baltimore City (Mr. Stockbridge) to the amendment he first offered. I am afraid it goes very much beyond what my colleague intends. The expression 'every person holding any office created by, or existing under the Constitution or laws of the State,' includes all the municipal officers of the City of Baltimore, I think. If the City of Baltimore choose to pay them more than three thousand dollars it is no business of ours. If the City of Baltimore pays a man four thousand dollars, why should we take one thousand dollars out of his pocket and put it into the State Treasury? It puts a restriction upon the City of Baltimore, that it shall not pay the city clerk or any other officer a higher salary than three thousand dollars. That is none of our business, if the people choose to pay more. They have not done so, so far as I am aware. I hope the house will reconsider its action on that amendment if the gentleman construes it as I do, to cover all offices.

"Mr. Abbott: The reason why I voted in favor of the amendment was that I was not aware in doing so that it would affect the corporation officers. If it does, I hope the gentleman will change the language of it.

"Mr. Stirling: It may be so construed, for the officers of Baltimore City are officers under the laws of this State.

"Mr. Stockbridge: If it is in order to offer an explanation, I will tell exactly what I meant. There have been certain officers, I may instance certain clerks, sheriffs, criers, officers about the courts in the State of Maryland, who have received fees to an amount larger than three thousand dollars, year after year, and have said that they were not officers of the State; that they were officers of the court. Those, in my apprehension, are just the sort of persons designed to be

reached by this. When persons have a fixed salary, it
is known; but there are none that have a fixed salary
by the State that are obnoxious to this, either in the
former constitution or as modified by the amendment.
It was designed to meet just such cases and no others,
where the fees and contingent emoluments of the office
amount to more than three thousand dollars. *The
design is that in all such cases the excess should go to
the State."*

The first clause of *Section* 1, *Article* 15 of the Constitu-
tion of 1867, in most of its important provisions, · is taken
from the Constitution of 1851 and 1864 upon the same sub-
ject. It applies in terms to all fee officers, except Justices of
the Peace, Constables and Coroners. Its language appears
to have been carefully selected to embrace all such officers—
and they were many,—*holding* any office created by or exist-
ing under *the* Constitution or laws of the State, whose pay
or compensation *is* derived from fees, or money coming into
his hands from the discharge of his official duties, etc. The
language of the second clause is more comprehensive and
would include every fee office thereafter created. The pro-
hibition in this clause is upon any person holding any office
* * * under *this* Constitution, etc. The terms of both clauses
are sufficiently broad and comprehensive to embrace all fee
officers then or thereafter created, "except in cases specially
provided for in this Constitution." There were *fee officers*
provided for by the Constitution of 1867, who were permitted
by that Constitution to receive from fees more than $3,000
per annum, as compensation for the discharge of their duties,
to wit: The Clerks of the Courts and Register of Wills of
Baltimore City. These officers, who were allowed to receive
$3,500 per annum, are *excepted cases specially provided in
the Constitution.*

Does the Act violate the Fourteenth Amendment to the
Federal Constitution? It is said that the imposition of a
portion of the salaries of the members of the Commission
upon the City is the taking of its private property without

due process of law.   The power of the Legislature over the City, it is true, is not absolute and unlimited; *Baltimore* v. *State,* 15 Md. 463; *Pumphrey* v. *Baltimore,* 47 Md. 152; *Talbott Co.* v. *Queen Anne Co.,* 50 Md. 259; and while it must deal with the City in subordination to the restraints and limitations of the Constitution, it does possess wide powers of control and legislation over it.   We find no restraint in the Constitution itself against the imposition upon the City of a portion of the burden of the expense of supporting the Commission.   Most of the important public service corporations and public utilities are located in the City, and the Legislature doubtless thought that the people of the municipality, who were most largely interested in the regulation and control of these corporations, would be the principal beneficiary of the work of the Commission, and for that reason imposed a part of the costs of its maintenance upon the City.   Its power to do that—and that is the only question we are to determine—finds support in the cases of *Baltimore* v. *State, supra; Revell* v. *Annapolis,* 81 Md. 1; *Mobile* v. *Kimball et al.,* 102 U. S. 691 (L. Ed.); *Daly* v. *Morgan,* 69 Md. 460.

In *Revell case, supra,* it appeared that the Act of 1894, Chapter 620, required the building of a public school house in the City of Annapolis, and apportioned the cost of its construction between the County and the City.   In discussing the power of the Legislature to do this, JUDGE ROBINSON said: "We recognize the force of the argument that the question whether a municipal debt is to be created ought to be left to the discretion and judgment of the people who are to bear the burden.   We recognize, too, the fact that the exercise of this power by the Legislature may be liable to abuse.   But the abuse of a power is no argument against its exercise.   The remedy, however, in such cases, is with the people, to whom the members of the Legislature are responsible for the discharge of the trust committed to them.   It is a matter over which the courts have no control.   If the debt

to be created was for a private purpose that would present a different question, for it is a fundamental principle, inherent in the nature of taxation itself, that all burdens and taxes shall be levied for public and not for private purposes. Be that as it may, it is well settled in this State that the Legislature has the power to compel a municipal corporation to levy a tax or incur a debt for a public purpose, and one within the ordinary functions of a municipal government.

In *Pumphrey's case,* 47 Md. 145, a mandamus was sued out to compel the Mayor and City Council of Baltimore to purchase a bridge over Gwynn's Falls, within the corporate limits, as directed by the Act of 1876; and the Court held that it was the duty of the City to build and keep in repair bridges over its highways, and that the Legislature had the power to compel it to buy a bridge already constructed.

And in *Mayor and C. C. of Balto.* v. *Reitz,* 50 Md. 574, it was decided that the Legislature had the power to compel the city authorities to acquire by condemnation a lot of ground in said city to be used as a public square or park. Again in *County Comrs. of Talbot County* v. *County Comrs. of Queen Anne's Co.,* 50 Md. 245, it was held that the Legislature had the power to compel the Commissioners of Talbot County to levy a tax to pay one-half of the expense of building a bridge over "Kent Island narrows," and on the ground that the bridge was a public improvement of special interest and advantage to that county.

And we may here add that the case of the *Commissioners of Revenue* v. *State,* 45 Ala. 399, which was so much criticised in the argument and which is also criticised by Judge Cooley, in his *Constitutional Limitations,* has, since the publication of the latter work, been confirmed without dissent by the Supreme Court of the U. S. *County of Mobile* v. *Kimball,* 102 U. S. 691. In that case the Legislature of Alabama appointed a Board of Harbor Commissioners for the purpose of deepening and improving the boy of Mobile, and directed that the Commissioners of Revenue for the County of Mobile

should issupe coupons of the county and deliver the same to the Harbor Commissioners to be sold and the proceeds applied in payment of the expenditure.  On application for a mandamus to compel the Commissioners of Revenue to issue the bonds, the Supreme Court held that the Act was a valid exercise of legislative power.  Referring to the Act, MR. JUSTICE FIELD says: "Here the objection urged is that it fastens upon one county the expense of an improvement for the benefit of the whole State.  Assuming this to be so, it is not an objection which destroys its validity.  When any public work is authorized, it rests with the Legislature, unless restricted by constitutional provisions, to determine in what manner the means to defray its costs shall be raised.  It may apportion the burden ratably among all the counties, or other particular subdivisions of the State, or lay the greater share or the whole upon that county or portion of the State specially and immediately benefited."

We do not find that the Act offends against Article 35 of the Declaration of Rights, which declares that "no person shall hold, at the same time, more than one office of profit or trust created by the Constitution or laws of this State."  The Act creates *one indivisible office,* and whatever the Legislature may have meant by the use of the words "as an employee of said municipal corporation," when referring to the additional payment by the City to the Commission and its general counsel, it is evident that it did not intend thereby to constitute them municipal officers of the City.

Having reached the conclusion that the Act is not invalid for any of the reasons considered, there ought not be any serious contention that its title is insufficient under section 3, Article 29 of the Constitution.  The title gave notice that the Legislature proposed to create and establish a Public Service Commission, and to make appropriations therefor.  Every person was chargeable with the notice, conveyed by the title, that it might make these appropriations in any manner it saw fit within its constitutional power, and having made them in

the way it had the power to do, the notice given was a sufficient compliance with the requirements of the Constitution. On account of the great importance of the case—affecting as it does the salaries of so many public officers—we have given each question presented by the record our careful consideration, and our conclusion is that the Act of 1910, Chapter 180, is not invalid for any of the reasons urged against it.

In reaching this conclusion we have recognized and applied the well-settled canons of construction:

First—That every presumption favors the validity of the statute; it cannot be stricken down as void unless it plainly contravenes some provision of the Constitution; a reasonable doubt as to its constitutionality is sufficient to sustain it, and the party assailing the Act must point out the special provision of the Constitution to which it is obnoxious. "Plenary power in the Legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception." *People* v. *Draper,* 15 N. Y. 453; *Lewis' App.* 67 Pa. St. 153. The general rule ·upon this subject is, that, except where the State or Federal Constitution has imposed limits upon the legislative power, it must be considered as practically unlimited; but this broad power appears to be subject in this State to some qualifications. *Regents, etc.,* v. *Williams,* 9 G. & J. 408; *Baltimore* v. *State.* 15 Md. 469.

Second—That section 29, Article 3 of the Constitution is mandatory; but the general disposition of the Court has been to give the section a liberal construction, so as not to interfere with or impede legislative action. The purposes of this provision of the Constitution are "to prevent the Legislature from the enactment of laws surreptitiously; to prevent 'log rolling' legislation; to give the people general notice of the character of the proposed legislation, so they may not be misled; to give all interested an opportunity to appear before the committees of the Legislature and to be heard upon the advisability of the proposed legislation; to advise members of

the character of the proposed legislation, and to give each an opportunity to intelligently watch the course of the proposed bill; to guard against fraud in legislation, and against false and deceptive titles. These purposes have been so plainly announced in numerous opinions by this Court that a statement of the rule and the citation of cases would seem to be sufficient." *State* v. *McKinney,* 29 Montana, 375; *Davis* v. *State,* 7 Md. 160; *Drennen* v. *Banks,* 80 Md. 310; *Baltimore* v. *Reitz,* 50 Md. 574; *County Commissioners* v. *School Commissioners of Worcester County,* 113 Md. 305.

Third—That the title, whilst it must indicate the subject, need not give an abstract of the Act; nor need it mention the means and methods by which the general purpose is to be accomplished. *Catholic Cathedral* v. *Manning,* 72 Md. 116; *Scharf* v. *Tasker,* 73 Md. 378; *Drennen* v. *Banks,* 80 Md. 310; *Whitman* v. *State,* 80 Md. 410.

In the brief of the learned city solicitor reliance is placed upon the cases of *Hyattsville* v. *Smith,* 105 Md. 322, and *Cecil* v. *County Commissioners,* 121 Md. 696. In the first of these cases the question presented by this record was not before the Court, although some general rules upon the subject of valid taxation are stated. In the second case the Court was dealing with a *fee officer,* and held that he was subject to the provisions of section 1, Article 15, of the Constitution.

*Order affirmed, with costs.*