MAYOR AND COUNCIL OF FOREST HEIGHTS ET AL.
*v.* TILLIE FRANK ET AL.

[No. 47, September Term, 1980.]

*Decided October 7, 1981.*

*Motions for reconsideration filed by Mayor and council of Mount Rainier and by Mayor and Council of Forest Heights November 4 and 6, 1981, respectively; denied November 20, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Raymond J. McDonough, J. Kent Holland, Jr.,* and *Morris Topf,* with whom were *McDonough & Schmuhl, P.A.* and *Reichelt, Nussbaum, Brown & Topf* on the brief, for appellants.

*Amicus curiae* brief of Prince George's County, Maryland filed, *Robert B. Ostrom, County Attorney, Michael O. Connaughton, Deputy County Attorney, Steven M. Gilbert* and *Robert N. Stokes, Jr., Associate County Attorneys,* on the brief.

*Kenneth A. Lechter,* with whom were *Michael J. Graham* and *Fisher & Walcek* on the brief, for appellees.

*Amicus curiae* brief of Maryland Municipal League, Inc. filed, *Roger W. Titus* on the brief.

ELDRIDGE, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and DIGGES, JJ., dissent. MURPHY, C. J., filed a dissenting opinion at page 352 *infra,* in which SMITH and DIGGES, JJ., concur in part. SMITH, J., filed a dissenting opinion at page 364 *infra,* in which DIGGES, J., concurs. DIGGES, J., filed a dissenting opinion at page 368 *infra.*

The issues in this case arise because of a possible conflict between a licensing ordinance of a chartered county and a prohibition on the licensed activity by two incorporated municipalities within the county.[1] The threshold question is whether the county and the municipal ordinances are in direct conflict. If they are, we must decide how the conflict is to be resolved in light of the provisions of the Maryland Constitution and Maryland Code relating to chartered counties and to incorporated municipalities.

The plaintiffs Bessie Frank and Delors Ristick applied for and were granted licenses from Prince George's County to practice fortunetelling at specified locations within the county, pursuant to Subtitle 5, Division 5, of the Prince

---

1. The terms "chartered county" or "home rule county" in this opinion refer to a county which has adopted a home rule charter pursuant to Art. XI-A of the Maryland Constitution. The term "municipality" refers to a municipality within the meaning of, and subject to, Art. XI-E of the Maryland Constitution.

George's County Code. The license issued to Ristick specifies a location within the corporate limits of the City of Mount Rainier; the location contained in the license issued to Bessie Frank is within the Town of Forest Heights.[2] Both Forest Heights and Mount Rainier had enacted ordinances prohibiting fortunetelling within their respective municipal limits prior to plaintiffs' commencing business at the specified locations.[3] The bill of complaint filed by Bessie Frank, Tillie Frank and Delors Ristick in the Circuit Court for Prince George's County, requested a judgment declaring that the Forest Heights and Mount Rainier ordinances prohibiting fortunetelling are in direct conflict with Prince George's County law and are, therefore, void. Subsequently, Prince George's County was made a party to the action pursuant to the Declaratory Judgment Act, Maryland Code

---

2. The address specified in Bessie Frank's license refers to property owned by the plaintiff Tillie Frank, in whose name a use-and-occupancy permit was issued by the Prince George's County Department of Licenses and Permits.

3. Sections 4.1 and 4.2 of Ordinance Code, Town of Forest Heights, took effect on August 15, 1979:

"*Section 4.1:* Fortunetelling

It shall be unlawful, and it is hereby prohibited within the Town for any person to attempt to tell fortunes or predict the future, for pay, donation or compensation, by means of palmistry, crystal ball, spirits, medium-ship, cards, talismans, charms, potions, tea-leaves, magic of any kind or nature, or other similar means, except that nothing herein shall be construed in any way to include or interfere with the exercise of any of the religious or spiritual practices of any bona fide church or religion.

"*Section 4.2:* Penalty

Any person violating any provision of this Article, upon conviction, shall be guilty of a misdemeanor and subject to a fine not to exceed One Hundred Dollars ($100.00), or imprisonment not to exceed 30 days or both fine and imprisonment. A conviction for one offense shall not be a bar to a conviction for a continuation of such offense subsequent to the first or any succeeding conviction."

Effective March 19, 1980, the fine specified in § 4.2 was increased to a sum not to exceed $500.00, and the possible term of imprisonment was raised from thirty to ninety days.

Section 10-120 of the Code of Ordinances of the City of Mount Rainier reads:

"It shall be unlawful for any person to demand or accept any remuneration or gratuity for forecasting or foretelling the future or for pretending to forecast or foretell the future by cards, palm reading, or any other scheme, practice or device, or to practice phrenology within the corporate limits of the City."

(1974, 1980 Repl. Vol.), § 3-405(b) of the Courts and Judicial Proceedings Article.

The Circuit Court for Prince George's County determined that Forest Heights and Mount Rainier had the power and authority under their respective charters and the federal and state constitutions to enact legislation prohibiting foretunetelling within municipal boundaries. The court, however, held that the municipal ordinances prohibiting foretunetelling were in direct conflict with the Prince George's County law under which the plaintiffs were licensed to tell fortunes at specific locations within the limits of the two municipalities. The court thus declared §§ 4.1 and 4.2 of the Forest Heights Ordinance Code, and § 10-120 of the Code of Ordinances of Mount Rainier, to be void. The two municipalities appealed to the Court of Special Appeals, and this Court granted their petition for certiorari prior to any action by the intermediate appellate court.

In challenging the declaratory judgment, Forest Heights and Mount Rainier make three arguments. First, they contend that there is no direct conflict between the licensing provisions of Subtitle 5, Division 5, of the Prince George's County Code and the two municipal ordinances. This position is based upon the premise that the county scheme is entirely restrictive and that the municipal legislation merely represents a permissible extension of this purpose. The second argument of the municipalities is that, even if there would otherwise be a conflict between the county law and the municipal ordinances, the county law has no application within the two municipalities. They contend that, under Art. XI-A, § 3, of the Maryland Constitution, legislation of a chartered county has no effect whatsoever within municipal limits if the county legislation concerns a matter on which the municipality has authority to legislate. Third, the municipalities argue that, if there is a direct conflict, and if both the county and the municipalities have power to enact legislation that is effective within the municipal limits, then the municipal ordinances should prevail.

The plaintiffs, on the other hand, insist that there is a direct conflict between the county law, pursuant to which

they obtained their licenses to engage in fortunetelling in Forest Heights and Mount Rainer, respectively, and the municipal ordinances which completely prohibit them from fortunetelling at the locations specified in the county licenses. They further argue that the county legislation applies throughout the entire county and that the authority of a chartered county supersedes that of a municipality, thereby rendering ineffective the prohibitory ordinances of Forest Heights and Mount Rainier.[4]

In keeping with this Court's established policy of not deciding constitutional questions unless necessary, *Simms v. State,* 288 Md. 712, 725, 421 A.2d 957 (1980), and cases there cited, we shall first consider whether the county law and the municipal ordinances are in conflict, irrespective of the reach of county law or which law should be given effect in the event of conflict.

I

In arguing that the county licensing statute does not conflict with the municipal ordinances, the municipalities claim that their ordinances merely represent a higher degree of regulation, *i.e.,* prohibition, than the already restrictive county law. In support of their interpretation of the county law as *restrictive,* rather than permissive, the municipalities point to the many requirements in the county law (*e.g.,* fingerprints, photographs, provision of criminal records) and the quantitative limits contained therein (*e.g.,* no more than one license per eighty thousand residents, with the total number of licenses issued not to exceed eight, and not more than two licenses per family). The municipalities conclude that their ordinances, completely prohibiting fortunetelling within municipal boundaries, are "clearly consistent" with the "limiting and restricting nature" of the county's licensing

---

4. Neither the plaintiffs nor Prince George's County challenge the circuit court's holding that the municipalities were authorized to enact ordinances prohibiting the business of fortunetelling. We shall assume, arguendo, that the ordinances are within the powers of the municipalities.

statute, and simply "carry the idea to the next logical limitation."

Wherever reasonably possible, courts will construe enactments so that there is no conflict. This principle avoids the need to invalidate one law or the other. *See Annapolis v. Annap. Waterfront Co.,* 284 Md. 383, 391, 396 A.2d 1080 (1979); *Wilson v. Bd. of Sup. of Elections,* 273 Md. 296, 301, 328 A.2d 305 (1974); *Acting Dir., Dept of F. & P. v. Walker,* 271 Md. 711, 718-719, 319 A.2d 806 (1974). We have also recognized that a local governmental unit may be justified in going. further than the policy in effect throughout the broader governmental unit. In *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A.2d 376 (1969), the Court considered whether there was a conflict between a Baltimore City ordinance establishing a minimum wage of $1.25, applicable to taverns, and a State law setting the minimum rate at $1.00, but specifically exempting taverns. This Court held that the Baltimore City law was harmonious with the State law, and that the provisions of the local law lent themselves to the "characterization of supplementation of the State law, rather than irreconcilable differences. . . . In none of the provisions of the listed conflicting regulations of the City law does it authorize a minimum wage which is lower than that provided by the State law, nor does it exempt any employees included under the State law; we think that is the crucial norm which must be used to measure the City law regarding any conflict with the statute." *Id.* at 324-325.

Turning to the present case, the municipalities' argument that the municipal ordinances merely supplement the restrictions provided in the County Code, does not withstand scrutiny. Neither the text of the county law, nor the practices employed by the county in issuing licenses, support an interpretation that the law is merely restrictive and not an affirmative authorization. Section 5-155(e) of the Prince George's County Code defines the "license" required by the county as "[a] certificate issued by the Director or his designee to a person . . . *enabling such person to engage in the business of fortunetelling* and similar practices . . . ." (Emphasis supplied.) Section 5-157 (b) (2) requires that an

application for a fortunetelling license contain a "legal description or address of the specific location used or proposed to be used in the operation or business of fortunetelling and similar practices . . . ." Thus, the County Code indicates that a license would, if issued, "enable" a licensee to practice fortunetelling at the "specific location" listed in the application. This is precisely the practice employed by Prince George's County. Pursuant to applications filed with the county, Bessie Frank and Delors Ristick were issued licenses, each of which "authorized [her] to practice fortunetelling" at a particular street address. The address specified in Bessie Frank's license is within the municipal limits of Forest Heights; the license issued to Ristick specifies a location within Mount Rainier. In light of the language of the county licensing statute, which "enables" one to practice fortunetelling, and the licenses actually issued, which "authorize" one to tell fortunes at a particular location, we cannot view the county law as merely providing restrictions on the practice of fortunetelling or as being neutral with respect to the practice. Instead, the language of the County Code indicates that a county license provides affirmative authorization to tell fortunes. It is in direct conflict with the prohibition on fortunetelling contained in the municipal ordinances at issue here.

This view is consistent with the holding in *City of Baltimore v. Sitnick and Firey, supra,* 254 Md. 303. As previously discussed, this Court in *Sitnick* acknowledged the authority of localities to enact laws in certain areas that supplemented the higher law. Nevertheless, the *Sitnick* court reiterated the rule that "a political subdivision may not prohibit what the State by general public law has permitted . . . ." *Id.* at 317. *See also Annapolis v. Annap. Waterfront Co., supra,* 284 Md. at 291, in which we recently pointed out that a conflict exists where a municipal law " 'prohibits something permitted by the legislature.' " In the instant case, the language of the County Code, and the licenses issued pursuant to its provisions, expressly permit each licensee to engage in the practice of fortunetelling at a specified location. There is simply no way that the municipal

ordinances *prohibiting* the practice of fortunetelling can be considered "supplemental" to the county's authorization to engage in the fortunetelling business.

Accordingly, we must consider the State constitutional questions raised by the municipalities.

## II

Forest Heights and Mount Rainier contend that, regardless of any apparent inconsistency between the county law and the municipal ordinances, such inconsistency is meaningless because an enactment by a home rule county has no effect within an incorporated municipality in the county, if the subject of the county law is a matter which the municipality is authorized to regulate. The legal basis for this argument is Art. XI-A, § 3, of the Maryland Constitution. Article XI-A, which provides the authority and mechanism for the creation and organization of home rule counties such as Prince George's, limits the powers given to such counties as follows (§ 3, emphasis added):

> "[P]rovided that nothing herein contained shall be construed to authorize or empower the County Council of any County in this State to enact laws or regulations *for any* incorporated town, village, or *municipality* in said County, on any matter covered by the powers granted to said town, village or municipality . . . ."

No party is challenging the circuit court's holding that, in the absence of county action, the municipalities had the authority under their charters to prohibit fortunetelling. Thus Forest Heights and Mount Rainier argue that the above-quoted constitutional language renders Prince George's County's licensing ordinance ineffective within *all* of the county's incorporated towns, villages and municipalities having authority, under their charters, to prohibit fortunetelling. This Court has not heretofore

addressed the issue of a county council's power to enact laws effective within the incorporated municipalities of that county.[5]

The argument of the municipalities that the county law has no effect within municipal boundaries is based entirely upon the language of Art. XI-A, § 3, that the county council

---

5. In Mont. Co. v. Md. Soft Drink Ass'n, 281 Md. 116, 131-135, 377 A.2d 486 (1977), the City of Rockville took the position that, under the prohibition in Art. XI-A, a home rule county's "revenue" legislation could apply in municipalities but that its "regulatory" legislation could not apply within the limits of the county's municipalities. The City argued that a Montgomery County law imposing a tax on non-returnable beverage containers was "regulatory" and that, because the ordinance applied in the municipalities, it was void under Art. XI-A. Without any discussion or holding regarding the scope of Art. XI-A, and accepting for purposes of that case the distinction drawn by Rockville, this Court rejected the argument that the county ordinance was void. While recognizing that the imposition of a tax is "a recognized mode of regulating the use of non-returnable beverage containers" (Id. at 132), we held that the county ordinance was a "revenue" measure and that, even under the distinction drawn by Rockville, was validly applicable in municipalities.

Although not dealing with the precise scope of the restriction in Art. XI-A relating to the applicability of county law to a municipality, the Court of Special Appeals in Griffin v. Anne Arundel County, 25 Md. App. 115, 135-137, 333 A.2d 612 (1975), held that the restriction did not apply to a county ordinance providing for the levying and collecting of real property taxes.

In this connection, it should be noted that historically in Maryland, licenses have been regarded as a significant revenue source, although to a lesser extent in recent years. See, e.g., Third Interim Report of the Commission on Administrative Organization of the State (the "Soboloff Commission") (August 1952), pp. 7-8, 19-23; Interim Report on Licenses of the Maryland Tax Survey Commission of 1949 (the "Case Commission") (February 1950), pp. 3-7; Report of the Maryland Commission on the Distribution of Tax Revenues (the "Sherbow Commission") (September 1946), pp. 113-120; Report of the Maryland Tax Revision Commission of 1939 (January 1941), pp. 92-109; Report of the Commission for the Revision of the Taxation System of the State of Maryland and City of Baltimore (October 1913), pp. 349-362. These study commission reports have generally divided licenses into two categories, namely "business licenses" or "revenue licenses" on the one hand and "regulatory licenses" on the other. Licensing requirements in the first category are viewed as essentially revenue measures, whereas "regulatory licenses" are "designed to insure minimal standards of proficiency and character on the part of those seeking to engage in certain trades, occupations and professions which directly affect public health, safety and welfare." Report of the "Case Commission," supra, p. 2.

In light of the interpretation of Art. XI-A adopted in this case, it will be unnecessary for us to consider whether the prohibitory language of Art. XI-A contemplates a distinction between "revenue" and "regulatory" ordinances, and, if it does, whether the Prince George's County fortunetelling ordinance, requiring a license fee of $250.00 every year, is a "revenue" or a "regulatory" measure.

shall not legislate "for any incorporated town, village or municipality." This language, however, does not require the construction urged by the municipalities. The quoted language of § 3 can be construed a second way, namely that a county cannot enact laws effective only for or within a particular municipality and not effective elsewhere in the county. The use of the phrase "for any . . . municipality," suggests that this second construction is the correct one. Moreover, in light of the purpose of Art. XI-A and the potential effects of a contrary result, we believe that the second construction represents the better reasoned approach.

Article XI-A of the Maryland Constitution was proposed by Ch. 416 of the Laws of Maryland of 1914 and ratified by the voters of this State in November 1915. As this Court has stated many times, the purpose behind this article was the transfer of local lawmaking powers from the State legislature to the county governments. *Ritchmount Partnership v. Board,* 283 Md. 48, 388 A.2d 523 (1978); *County Council v. Investors Funding,* 270 Md. 403, 413, 312 A.2d 225 (1973); *Mont. Citizens League v. Greenhalgh,* 253 Md. 151, 160, 252 A.2d 242 (1969); *Scull v. Montgomery Citizens,* 249 Md. 271, 274, 239 A.2d 92 (1968); *State v. Stewart,* 152 Md. 419, 422, 137 A. 39 (1927). Article XI-A, § 3, gives the county council "full" legislative power to enact local laws on all matters covered by the grant of express powers under Art. XI-A, § 2. *Cheeks v. Cedlair Corp.,* 287 Md. 595, 608-609, 415 A.2d 255 (1980); *Mont. Citizens League v. Greenhalgh, supra,* 253 Md. at 160. Subsequent to a county's organization under Art. XI-A, the General Assembly no longer has the constitutional authority to enact public local laws for the county on any subject covered by the express powers granted to home rule counties. Md. Const. Art. XI-A, § 4. Rather, as this Court stated in *Mont. Citizens League v. Greenhalgh, supra,* 253 Md. at 160:

> "The purpose and intent of the legislature in supplying the implementation called for by Art. XI-A by the passage of the express powers act was

to take from the legislature and *give to the County the exclusive power to enact local laws,* and the reasons for this delegation of power, commonly called home rule, were first to reduce as far as possible the log jam of unacted on measures in the late days of the legislative session in Annapolis which had caused passage of laws that had not received careful scrutiny or due consideration and, second, 'to permit local legislation to be enacted solely by those directly affected by it without interference from representatives of other sections of the State.' " (emphasis added.)

Thus, subsequent to a county's organization as an Art. XI-A home rule county, only the county council is authorized to enact public local laws effective throughout that county.

The powers of incorporated municipalities are provided for in Art. XI-E of the Maryland Constitution and Art. 23A of the Maryland Code. Under §§ 1 and 6 of Art. XI-E, and § 2 of Art. 23A, a municipality's lawmaking powers are subject to all applicable laws enacted by the General Assembly, including a public local law applicable throughout one county. Since the purpose of Art. XI-A was to transfer the General Assembly's power to enact county public local laws to the councils of Art. XI-A home rule counties, it logically follows that those counties should generally have the same relationship vis-a-vis municipalities within their borders as the General Assembly would have in enacting public local laws in the county in the absence of county home rule government. If the interpretation of Art. XI-A, § 3, urged by the municipalities were adopted by the Court, this would result in the incongruous situation whereby a municipality located in an Art. XI-A home rule county would have greater powers than a municipality in a county not organized under Art. XI-A. Neither the wording nor the history of Art. XI-A indicate that such a result was intended.

In addition, the legislative history associated with the adoption of Art. XI-E suggests an understanding that home rule county licensing ordinances, such as the one here

involved, were and would continue to be effective in municipalities unless the Legislature enacted further restrictions upon county law-making power. Art. XI-E of the Maryland Constitution was proposed by the Commission on Administrative Organization of the State, known as the "Sobeloff Commission" after its first chairman. The proposed Art. XI-E was enacted by the Legislature and ratified by the voters in 1954. In addition to proposing what became Art. XI-E of the Constitution, the Sobeloff Commission made several other proposals with respect to local government in Maryland. Included were recommendations for changes in Art. XI-A that would have, in effect, made all counties "home rule" counties. See the Second Interim Report of the Sobeloff Commission (June 1952), pp. 5-7, 42-49.[6] In addition, the Sobeloff Commission specifically recommended legislation whereby "[c]ounty authorization to license should apply *only* to areas outside incorporated municipalities, which would have the power to set their own fees." Third Interim Report of the Sobeloff Commission (August 1952), p. 23 (emphasis added). This recommendation was based on the premise that, absent further legislative restrictions, home rule county licensing ordinances could be applicable in municipalities. The General Assembly, although adopting most other recommendations of the Sobeloff Commission concerning the authority of municipalities, did *not* adopt this proposed restriction upon county legislative authority in municipalities.[7]

There is another indication of the Sobeloff Commission's view, apparently accepted by the Legislature, that county legislation would be applicable in municipalities under the new Art. XI-E. The Commission proposed that, before any area in a county could incorporate as a municipality, it would need the approval of the county government. The Legislature adopted this recommendation, which appears in

---

6. These recommendations were not adopted by the General Assembly.

7. A similar proposal to limit county licensing ordinances to areas of the county outside of municipalities had been made a few years earlier by the "Case Commission," Interim Report on Licenses, *supra,* pp. 9-10, and had been rejected by the General Assembly.

Code (1957, 1981 Repl. Vol.), Art. 23A, § 21, providing: "No municipal corporation shall be created under the provisions of this subtitle without the specific approval of the board of county commissioners *or of the county council* of the county in which the proposed municipal corporation is located." (emphasis supplied.) In explaining the reasons for this provision, the Sobeloff Commission stated (Second Interim Report, *supra,* p. 36, emphasis supplied):

> "The authority to veto incorporations would be given to the county since it has a very definite stake in the incorporation of a new town. The creation of a new taxing unit may affect its tax collections; a town *may* duplicate county services and then *attempt* to get a lower county tax rate in the town in return for withdrawal of the county service; *jurisdictional disputes may arise . . . ."*

The idea that county services can be furnished within a municipality and that jurisdictional disputes may arise, indicates an understanding that county laws could be applicable in municipalities on matters which would also fall within the authority of the municipalities.

Construing the prohibition in Art. XI-A, § 3, to mean that a home rule county may not enact legislation just for one particular municipality, but that its countywide legislation may operate equally in all municipalities throughout the county, is consistent with Art. XI-A's purpose of transferring local lawmaking power from the State Legislature to the appropriate county council. This result is analogous to the limitation of Art. XI-E, § 1, which prohibits the General Assembly from enacting legislation effective in a particular municipality *unless* it applies to all municipalities within a class.[8] These restrictions reflect a desire to avoid legislation aimed at only certain specific municipalities.

---

**8.** The Commission on Administrative Organization of the State (the "Sobeloff Commission"), which had proposed Art., XI-E, in its Second Interim Report, p. 47, drew an analogy between the two prohibitions and suggested that the wording of the Art. XI-A prohibition be changed to correspond with the wording of the Art. XI-E limitation upon the General

The construction of Art. XI-A, § 3, urged by the municipalities in the instant case, could have drastic consequences. Many of the municipalities in this State are small governmental units that are able to provide very few services to their residents. If county legislation may not constitutionally apply within these towns and villages, they would be forced to provide many governmental services now provided by the county or do without the services. Some of the services involved are necessary, but the small municipalities simply are not in a position to provide them.[9] Forest Heights and Mount Rainier in argument before us acknowledged this problem, but urged that such towns could by agreement permit a county to exercise authority within the municipal boundaries. This answer is constitutionally unsound. If, as Forest Heights and Mount Rainier contend, the restriction on county power contained in Art. XI-A, § 3, means that county legislation may not apply within municipalities, nothing that a municipality might say or do could confer upon a county authority which the State Constitution specifically denies.

Assembly, pointing out that "[t]his alteration contemplates no change in the authority of counties over municipalities." The Legislature, however, did not enact a proposed constitutional amendment changing the wording of the Art. XI-A restriction.

9. The Maryland Commission on City-County Fiscal Relationships, in a report submitted to Governor Tawes on December 30, 1963, listed typical municipal services and set forth which of these services each municipality in the State furnished to its own residents. Of the first five basic services listed, namely police protection, fire protection, sewer, waste collection, and water supply, only five of the Art. XI-E municipalities furnished all of these services as of 1963. Thirty-two municipalities supplied only two of these services; thirty supplied only one of them; and fifteen supplied none. Report of the Maryland Commission on City-County Fiscal Relationships (1963), pp. 36-41.

The General Assembly has recognized that counties often perform services within municipalities, and it has authorized tax rate differentials in cases where a municipality "performs governmental services or programs in lieu of similar county governmental services or programs." Code (1957, 1980 Repl. Vol.), Art. 81, § 32A. See Apostol v. Anne Arundel County, 288 Md. 667, 421 A.2d 582 (1980). Various commissions or task forces have throughout the years studied the matter of municipal services, whether they are performed by the county or the municipality, and whether a tax rate differential should be mandated when the municipality performs certain services thereby relieving the county of the necessity for so doing. A most recent study is the 1979-1980 Report of the Subcommittee on Revenue Structure and Expenditure Patterns of the Task Force to Study State-Local Fiscal Relationships (December 1980), pp. 45-48.

· We hold, therefore, that the restriction in Art. XI-A, § 3, that a county may not enact laws "for" a municipality on any matter within the municipality's powers, does not mean that a county's general legislation is not effective in municipalities. Rather, this restriction reflects an intent that an Art. XI-A home rule county may not enact a law solely for, and limited to, a particular municipality or particular municipalities if the municipality had power to legislate regarding the matter.

### III

As the Prince George's County licensing ordinance is applicable in Forest Heights and Mount Rainier, and as it conflicts with the ordinances enacted by the two municipalities, the final issue in the case is whether the county or the municipal ordinances prevail.

There is no provision in either Art. XI-A or Art. XI-E of the Constitution which directly relates to the matter of a conflict between a county-wide ordinance enacted by a county council and an ordinance of a municipality located within the county. This absence is perhaps understandable, as Art. XI-A, § 2, and Art. XI-E, §§ 1 and 6, give the General Assembly broad authority to determine the powers of chartered counties and municipalities, as long as enactments relating to chartered counties are public general laws and as long as enactments relating specifically to municipalities apply alike to all municipalities of the same class.[10] Consequently, by delineating the powers of chartered counties and municipalities, the General Assembly has full authority by statute to resolve conflicts, either in specific areas or generally.

---

10. Art. XI-E, § 2 of the Constitution, provides that the "General Assembly, by law, shall classify all such municipal corporations by grouping them into not more than four classes based on population . . . ." In Art. 23A, § 10, of the Code, the General Assembly grouped all of the municipalities into a single class.

In certain areas, the General Assembly has minimized the possibility of conflict, specifically delineating the authority of counties and municipalities with respect to each other.[11] Moreover, in other areas, matters that may be popularly viewed as "local" are actually controlled by public general laws enacted by the General Assembly, and thus the issue of a conflict between county and municipal ordinances is unlikely to arise. Many "local" licenses fall within this category.[12]

Although the General Assembly by legislation in certain areas has reduced the likelihood of conflict between ordinances of a chartered county and municipality, nevertheless, with respect to matters falling outside of these areas, the Legislature has not expressly set forth a general rule as to which shall prevail in the event of conflict.[13]

11. See, *e.g.*, Code (1957, 1981 Repl. Vol.) Art. 23A, §§ 9(c), 19(s), 19A(e); Code (1957, 1978 Repl. Vol.) Art. 66B, §§ 3.01(b), 5.01, 7.03, and Art. 66D, §§ 3-102 through 3-106, 7-103, 7-105, 8-112, 8-112.1, all relating to planning and zoning.

12. For example, this category includes licenses for traders of all types, hawkers and peddlers, auctioneers, billiard tables, music boxes, pinball machines and other amusement devices, vending machines, private detectives, horse riding stables, music festivals, garages, employment agencies, trading stamp companies, wholesale farm machinery dealers, soda fountains, storage warehouses, moving and storage firms, dry cleaners and laundries, restaurants, plumbers, construction firms, dogs, real estate brokers, junk dealers, surveyors, and many other types. The requirements for obtaining all of these licenses are set forth by the General Assembly, and generally the licenses are issued by state officials and the fees are paid to state officials, usually the clerks of the circuit courts. See Code (1957, 1979 Repl. Vol.), Art. 56. The fees for many of these licenses, although expressly designated as "state funds," are distributed to counties and municipalities, on a basis set forth in detail by the General Assembly. Art. 56, §§ 3-4.

Both the Interim Report on Licenses of the "Case Commission" in 1950, *supra*, pp. 9-11, and the Third Interim Report of the "Sobeloff Commission" in 1952, *supra*, pp. 4, 19-23, recommended that the state laws providing for most of these licenses and the collection of the fees be repealed, and that the matter be handled by county and municipal legislation. These recommendations were rejected by the General Assembly.

13. Of course, the likelihood of a conflict is further reduced by the judicially developed principle, discussed in Part I of this opinion, that, wherever reasonably possible, courts will construe statutes so as to avoid conflict. The seminal case in Maryland setting forth this principle in the context of a local ordinance was Rossberg v. State, 111 Md. 394, 416-417, 74 A. 581 (1909). It is noteworthy that in sixteen cases to come before this Court since that time, involving a claimed conflict between a state statute and a local ordinance, the Court construed the statutes to be in harmony in eleven of the cases.

The only statutory provision generally relating to conflicts between "county" and municipal legislation is Code (1957, 1981 Repl. Vol.), Art. 23A, § 2, which provides in pertinent part (emphasis supplied):

> "The legislative body of every incorporated municipality in this State, except Baltimore City, by whatever name known, shall have general power to pass such ordinances *not contrary to the* public general or *public local laws* and the Constitution of Maryland as they may deem necessary . . . ." [14]

The plaintiffs and Prince George's County argue that the phrase "public local laws" in the above-quoted statutory provision includes enactments by the legislative body of a home rule county and that, therefore, the General Assembly has provided that an ordinance of a chartered county prevails over a conflicting ordinance of a municipality located within the county. Forest Heights and Mount Rainier, on the other hand, contend that the phrase "public local laws" in the statute refers only to those public local laws enacted by the General Assembly itself.

In light of the purpose of Art. XI-A of the Constitution, which was to transfer the General Assembly's power to enact public local laws for a chartered county to the county council, and in light of the mandate in Art. XI-A, § 4, that "no public local law shall be enacted by the General Assembly for said . . . County," this Court has consistently viewed the enactments of an Art. XI-A county as the "public local laws"

---

14. Art. 23A, § 2, was initially enacted in 1947, being Ch. 731 of the Acts of 1947. Section 2 of Ch. 731, later codified as Art. 23A, § 4, exempted certain municipalities from the statute, including the municipalities in Prince George's County. This was prior to Art. XI-E, § 1, of the Constitution, which required the General Assembly to act in relation to municipalities only by general laws applying alike to all municipalities of a class. Because of its earlier date of enactment, the exemption in Ch. 731 was, of course, valid. The exemption was repealed by Ch. 451 of the Acts of 1973, and now all municipalities are subject to Art. 23A, § 2. This Court has suggested that the 1973 repeal may have been prompted by a legislative recognition that the exemption was inconsistent with Art. XI-E, § 1, of the Constitution. Bowie Inn v. City of Bowie, 274 Md. 230, 248, 335 A.2d 679 (1975).

or "local laws" of that county.[15] *See, e.g., Ritchmount Partnership v. Board, supra,* 283 Md. at 54-58; *Steimel v. Board,* 278 Md. 1, 6-8, 357 A.2d 386 (1976); *Anne Arundel Co. v. McDonough,* 277 Md. 271, 287, 354 A.2d 788 (1976); *State's Atty v. City of Balto.,* 274 Md. 597, 603-605, 337 A.2d 92 (1975); *County Council v. Investors Funding, supra,* 270 Md. at 413; *Mont. Citizens League v. Greenhalgh, supra,* 253 Md. at 160; *Scull v. Montgomery Citizens, supra,* 249 Md. at 277; *Co. Com'rs v. Supervisors Of Elec.,* 192 Md. 196, 204-206, 63 A.2d 735 (1949). This was true long before 1947 when Art. 23A, § 2, of the Code was first enacted by the General Assembly. *See State v. Stewart,* 152 Md. 419, 422-424, 137 A. 39 (1927).

Moreover, with regard to other state statutes using without qualification the phrase "public local law," this Court has construed the phrase to include an ordinance enacted by the legislative body of an Art. XI-A subdivision as well as an enactment by the General Assembly. *Herman v. M. & C. C. Of Baltimore,* 189 Md. 191, 195-196, 55 A.2d 491 (1947) (holding that an ordinance enacted by the Mayor and City Council of Baltimore, which is an Art. XI-A home rule jurisdiction and not a municipality under Art. XI-E, was a "public local law" within the meaning of Art. 1, § 13, of the Maryland Code). This construction is consistent with the usage of the phrase by the framers of the Maryland Constitution. In addition to the language of Art. XI-A, the

---

15. Art. XI-A, § 4, of the Constitution, prohibiting the Legislature from enacting public local laws for a chartered county and setting forth the distinction between public local laws and public general laws, uses the terms "public local laws" and "Local Laws" interchangeably. That section provides in its entirety:

"From and after the adoption of a charter under the provisions of this Article by the City of Baltimore or any County of this State, no public local law shall be enacted by the General Assembly for said City or County on any subject covered by the express powers granted as above provided. Any law so drawn as to apply to two or more of the geographical subdivisions of this State shall not be deemed a Local Law, within the meaning of this Act. The term "geographical sub-division" herein used shall be taken to mean the City of Baltimore or any of the Counties of this State."

Our cases, similarly, have used the two phrases interchangeably. See, *e.g., Scull v. Montgomery Citizens,* 249 Md. 271, 239 A.2d 92 (1968) (compare 249 Md. at 274 with 249 Md. at 277).

phrase "public local law" used elsewhere in the Constitution clearly includes a local ordinance enacted by a home rule jurisdiction. *See* Art. XI-F, §§ 3, 6 and 7 (relating to code counties, and providing, *inter alia*, that "a code county may enact, amend or repeal a public local law of that county" (§§ 3 and 6)). On the other hand, when the framers of constitutional provisions intended that the term "public local law" be limited to enactments of the General Assembly, they have clearly so qualified the language. *See, e.g.,* Art. XI-F, § 8 (stating in part that "Public local laws enacted by the General Assembly under this section prevail over any public local laws enacted by the code county . . ."); Art. XVI, § 3 (a) (referring to "any Public Local Law for any one County or the City of Baltimore" which was "passed by the General Assembly"). And when the intent of the Constitution was to exclude enactments of Art. XI-A counties from the meaning of "public local law," it has been expressly so stated. *See* Art. XI-F, § 1.

Therefore, when the phrase "public local law" is used by the Legislature without qualification, and when neither the context nor other indicia of legislative intent suggest a different meaning, the phrase should be construed to include the enactments of home rule counties under Art. XI-A. This result is compelled by our cases and by the usage in the Constitution.

Consequently, we agree with the plaintiffs and Prince George's County that an authorized county-wide ordinance by a chartered county is a "public local law" within the meaning of Art. 23A, § 2. Moreover, as no other public general laws have a bearing upon the particular conflict here, we hold that under Art. 23A, § 2, the Prince George's County fortunetelling licensing ordinance prevails over the prohibitory ordinances of the two municipalities.

It should be emphasized, however, that our holding is limited to the type of conflict presented in this case. With regard to other types of claimed conflict, a different result may obtain. As previously pointed out, in some areas the General Assembly has delineated the authority of counties

and municipalities in relation to each other. In addition, under circumstances different from those involved in this case, to give effect to chartered county legislation over conflicting municipal ordinances might be contrary to the intent embodied in other general enactments by the Legislature. For example, if a chartered county ordinance were designed to prohibit a municipality in the county from exercising the express enumerated powers granted to municipalities by the General Assembly in Art. 23A, § 2 (1)-(31), or in other public general laws, an entirely different case would be presented.[16]

The county ordinance in the present case, however, is a typical licensing regulation applicable throughout the entire county; the object of the legislation is a particular type of private business. It is like the public local laws enacted by the General Assembly for certain non-chartered counties, providing for the licensing of fortunetellers at an identical or greater fee. Code (1957, 1979 Repl. Vol.), Art. 56, § 134A (Cecil County — $250.00 annual fee), § 134B (Charles County — $250.00 annual fee), § 134C (Calvert County — $1,000.00 fee for a three month period). Concededly, in light of Art. 23A, § 2, the municipalities in Cecil, Charles and Calvert counties could not countermand the county licensing authority under these three public local laws enacted by the General Assembly. Our decision in the instant case merely gives equal effect to the similar public local licensing law enacted by the Prince George's County Council.

*Judgment affirmed.*
*Petitioners to pay costs.*

---

**16.** It should be noted that none of the express powers of municipalities set forth in Art. 23A, § 2, or in other provisions of the Maryland Code, encompasses a prohibition of the business of fortunetelling. Nor would such authority be implied under the so-called "Dillon" rule recognized in our cases. New Carrollton v. Belsinger Signs, 266 Md. 229, 237, 292 A.2d 648 (1972); McRobie v. Town of Westernport, 260 Md. 464, 466, 272 A.2d 655 (1971). The claimed authority of the municipalities in the present case is based upon the municipal charters.

*Murphy, C.J., dissenting:*

I agree that there is a direct conflict between the county ordinance licensing fortunetelling within municipal boundaries and the ordinances of the two home rule municipalities which prohibit fortunetelling within their respective borders. I disagree with the Court, however, that the provisions of the Maryland Constitution and Maryland Code relating to charter counties and to home rule municipalities require that the conflict be resolved in favor of the county ordinance. To the contrary, I think the municipal ordinances prevail over the county ordinance. I, therefore, respectfully dissent.

The Court holds, quite correctly, that the purpose behind Art. XI-A was to transfer local lawmaking powers from the State Legislature to the county councils of chartered counties and to invest them with full legislative power to enact local laws on all matters covered by the grant of express powers under Art. XI-A, § 2, as implemented by Art. 25A of the Maryland Code. I most emphatically disagree with the Court's conclusion, however, that it thereby "logically follows that those counties should generally have the same relationship vis-a-vis municipalities within their borders as the General Assembly would have in enacting public local laws in the county in the absence of county home rule government." Such a conclusion finds no support in the provisions of Art. XI-A and, moreover, is completely at odds with the purpose of Art. XI-E — the Municipal Home Rule Amendment — and the grant of express powers to municipalities under Art. 23A of the Maryland Code.

Nor do I agree with the Court's narrow construction of the limitation imposed by Art. XI-A, § 3 upon the power of chartered counties to enact laws for municipalities, namely, that it only prohibits a chartered county from enacting laws effective only for or within a particular municipality but not from enacting countywide legislation affecting municipalities so long as it operates equally in all municipalities within its boundaries. To so conclude is to

seriously undermine the object and purpose of municipal home rule government. I also disagree with the majority that a chartered county ordinance is a "public local law" within the contemplation of § 2 of Art. 23A of the Code and that as a consequence municipalities may not exercise the "general" police powers there granted in contravention of a county ordinance. This, too, is an erroneous conclusion with dire consequences to the future effectiveness of municipal government — a conclusion never contemplated by the Legislature which, in enacting § 2 seven years prior to the adoption of Art. XI-E, intended only that a municipality could not exercise the general police power there granted if "contrary to the public general or public local laws," meaning such laws enacted by the General Assembly of Maryland.

Vital to a proper interpretation of Art. XI-A and Art. XI-E of the Maryland Constitution and their implementing statutes is an understanding of fundamental precepts which underlie the relationship between the State, on the one hand, and counties and incorporated municipalities on the other, as well as the relationship between counties and municipalities within their borders. The powers of a county have a direct reference to the general policy of the government of the State, while municipalities are chartered for a specific purpose, *i.e.,* to exercise within a limited sphere the powers of the State in the interest, convenience and advantage of persons residing within the particular incorporated locality. *See Centreville v. Queen Anne's County,* 199 Md. 652, 87 A.2d 599 (1951); *Daly v. Morgan,* 69 Md. 460, 16 A. 287 (1888). Historically, in Maryland, counties and municipalities have been regarded as coequal political subdivisions of the State, each exercising a portion of the State's delegated governmental powers connected with the administration of local government within its respective sphere of operation. Neither unit of local government is possessed of inherent police power and neither is legislatively superior to the other. They are separate and distinct governmental entities, operating on different and independent tracks, although they derive all of

their powers from the same source, *i.e.,* from the State through enactments of the General Assembly of Maryland or pursuant to provisions contained in the Maryland Constitution. *See Maryland Committee v. Tawes,* 229 Md. 406, 184 A.2d 715 (1962), *rev'd on other grounds,* 377 U.S. 656 (1964); *Perry v. Board of Appeals,* 211 Md. 294, 127 A.2d 507 (1956); *Neuenschwander v. Wash. San. Com.,* 187 Md. 67, 48 A.2d 593 (1946); *Clauss v. Board of Education,* 181 Md. 513, 30 A.2d 779 (1943); *Howard County v. Matthews,* 146 Md. 553, 127 A.2d 118 (1924); *Daly v. Morgan, supra, Darling v. Baltimore,* 51 Md. 1 (1879); J. Spencer, *Contemporary Local Government in Maryland* (1965); D. Thompson and E. Kelleher, *The Applicability in Maryland of County Law to Municipalities Located Within the County* (Maryland Technical Advisory Service, 1975). Counties are not sovereign and, like cities, enjoy only the status of municipal corporations. *Maryland Committee v. Tawes, supra; Howard County v. Matthews, supra.*

It is the general rule that a county has no legal power to legislate for a municipality located within its limits upon any subject which is within the scope of the powers granted to the municipality. 1 C. Antieau, *Municipal Corporation Law,* § 1.32 (1972); 62 C.J.S. *Municipal Corporations* § 114 (1949); 56 Am. Jur. 2d *Municipal Corporations* § 18 (1971); *Ex Parte Knight,* 55 Cal. App. 511, 203 P. 777 (Cal. App. 1921); *Ben Lomond, Inc. v. City of Idaho Falls,* 92 Idaho 595, 448 P.2d 209 (1968); *City of Richmond v. Board of Supervisors,* 199 Va. 679, 101 S.E.2d 641 (1958).

Prior to the advent of county and municipal home rule in Maryland, counties and municipalities were subject to the absolute control of the State Legislature. The "movement" for county and municipal home rule was "fueled by widespread public indignation over excessive legislative interference with and insensitivity toward local problems and concerns, and by a growing dissatisfaction with the enormously inefficient system of performing local law-making functions at the state level." *Ritchmount Partnership v. Board,* 283 Md. 48, 55-56, 388 A.2d 523 (1978). As *Ritchmount* indicates, the purpose of home rule

"was to restore and revitalize local government by giving citizens of counties and municipalities the power to legislate as to local matters free from undue encroachment by state legislatures." *Id.* at 55. The theory behind the principle of home rule, as explained in *Ritchmount,* "is that the closer those who make and execute the laws are to the citizens they represent, the better are those citizens represented and governed in accordance with democratic ideals." *Id.* at 56.

The Home Rule Amendment, Art. XI-A (ratified in 1915) authorized counties to adopt a charter form of government "subject only to the Constitution and Public General Laws of this State." § 1. Section 2 of Art. XI-A directed the General Assembly to provide by statute a grant of express powers for those counties adopting a charter. Section 3 invested chartered counties with "full power to enact local laws of said . . . County including the power to repeal or amend local laws of said . . . County enacted by the General Assembly, upon all matters covered by the express powers granted," with the proviso, however:

> "that nothing herein contained shall be construed to authorize or empower the County Council of any County in this State to enact laws or regulations for any incorporated town, village, or municipality in said County, on any matter covered by the powers granted to said town, village, or municipality by the Act incorporating it, or any subsequent Act or Acts amendatory thereto."

Section 4 of Art. XI-A provided that "no public local law shall be enacted by the General Assembly for said . . . County on any subject covered by the express powers granted . . . ."

Our cases indicate that Art. XI-A, as implemented by the express powers granted to chartered counties under Art. 25A of the Code, provided the fullest measure of local self-government to such counties in respect of their local affairs. *County Council v. Investors Funding,* 270 Md. 403, 312 A.2d 225 (1973); *Mont. Citizens League v. Greenhalgh,*

253 Md. 151, 252 A.2d 242 (1969). Included among the express powers granted to chartered counties was authority in § 5(S) of Art. 25A to pass all ordinances "deemed expedient in maintaining the peace, good government, health and welfare of the county." As to this grant of general police power, we said in *Mont. Citizens League v. Greenhalgh, supra,* 253 Md. at 160-61:

> "Gratification would not be afforded the purposes of home rule or the reasons which prompted it if the language of § 5 (S) of Art. 25A were not to be construed as a broad grant of power to legislate on matters not specifically enumerated in Art. 25A and the language of that section clearly indicates that such a construction is sound. . . .
>
> "A grant of power to pass laws for the peace, good government, health and welfare of the community is sometimes referred to as 'a general welfare or general grant of power clause,' 6 McQuillin, *Municipal Corporations* (3rd Ed.), § 24.43, and:
>
>> 'Under it ordinances may be passed which are necessary and beneficial, and they will be adjudged valid by the courts, provided they are responsible and consonant with the general powers and purposes of the local corporation, and not inconsistent with the United States Constitution, treaties and statutes, and the laws and policy of the state.' "

As we summarized in *Ritchmount Partnership:*

> "The exercise of local legislative powers [by a chartered county] is subject at all times to provisions of the Constitution and general law, and is limited to those matters allocated by the express powers which the Legislature has delegated under Article 25A of the Annotated Code. . . . [Art. XI-A] mandates that the General Assembly expressly enumerate and delegate those powers exercisable

by counties electing a charter form of government. . . . In compliance with this constitutional injunction, the Legislature enacted in 1918 the Express Powers Act, which, as amended, endows charter counties with a wide array of legislative and administrative powers over local affairs. Art. 25A, § 5. These 'legislative powers' are those usually associated with the objects of government — that is, powers to legislate for the benefit of the health, safety and general welfare of the local community.

"Once a particular power has been delegated under Article 25A, the Home Rule Amendment forbids the State Legislature from enacting any further public local laws within the scope of the express power so granted . . . until such time as the Legislature withdraws the power by public general law. Moreover, under Art. XI-A, § 3 the county council of a chartered county has full power to enact local laws and to repeal or amend local laws of the General Assembly applicable solely to the county, so long as the county legislation is covered by one or more of the express powers enumerated in Article 25A." 283 Md. at 57.

It is thus evident that while the powers of chartered counties are both full and broad, they are, in addition to being subject to the public general laws of the State, also circumscribed by the provisions of the Maryland Constitution and in particular Art. XI-A, § 3 — that a chartered county has no power to enact laws for "any" incorporated municipality within the county on "any" matter covered by the powers granted to the municipality. This limiting provision, in the plainest of language, constitutes explicit recognition of the general rule that a county has no legal power (absent a delegation of power from the General Assembly) to legislate for any municipality located within its boundaries upon any subject which is within the scope of the powers granted to the municipality.

Indeed, as we said in *Md.-Nat'l Cap. P. & P. v. Rockville,* 272 Md. 550, 325 A.2d 748 (1974), Art. XI-A, § 3 "limits the power of a County to enact laws for a local municipality" and *"precludes counties from exercising the legislative power actually granted to municipalities." Id.* at 557-58 (emphasis supplied). It is thus clear that the General Assembly retained the power to legislate for municipalities to the exclusion of chartered counties. It did not intend to, nor did it, relinquish or transfer any part of its authority over municipalities to chartered counties.

Prior to the ratification in 1954 of Art. XI-E (the Municipal Home Rule Amendment), all municipal charters were granted by the General Assembly, pursuant to public local law, which set forth the powers delegated by the Legislature to the municipality. By ch. 731 of the Acts of 1947 — a public general law now codified as §§ 1 — 5 of Art. 23A of the Maryland Code (and to which charter county ordinances are subordinate) — the Legislature provided incorporated municipalities with a grant of wide-ranging express powers which, as specifically enumerated in § 2, included "general power":

> "to pass such ordinances not contrary to the public general or public local laws and the Constitution of Maryland as they may deem necessary in order to. assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, to secure persons and property from danger and destruction, and to protect the health, comfort and convenience of the citizens of the municipality . . . ."

Following this "general" grant of power, § 2 provides that municipalities shall have additional express ordinance-making powers as thereafter enumerated in subsections (1) through (31). Included among such powers, for example, is the power to establish and maintain fire and

police departments, to acquire property for municipal purposes, and to adopt a municipal building code.[1]

It was, of course, the purpose of the Municipal Home Rule Amendment to permit municipalities to govern themselves in local matters. *Birge v. Town of Easton,* 274 Md. 635, 337 A.2d 435 (1975); *Woelfel v. Mayor and Aldermen,* 209 Md. 314, 121 A.2d 235 (1956); *Hitchins v. City of Cumberland,* 208 Md. 134, 117 A.2d 854 (1955). To this end, Section 1 of Art. XI-E prohibits the General Assembly from passing any public local law "relating to the incorporation, organization, government, or affairs" of an incorporated municipality. The section provides that the General Assembly "shall act in relation to the incorporation, organization, government, or affairs" of such municipalities only by public general laws applicable alike to all municipalities in one or more classes, as designated by the General Assembly by statute (the General Assembly subsequently designated but one class of municipality). Section 3 permits municipal corporations to amend or repeal existing charters or local laws relating to their incorporation, organization, government, or affairs which were previously enacted by the General Assembly and to adopt new charters and to amend or repeal any charter adopted under the provisions of the Article. Section 6 provides that all such charter provisions or amendments thereto "shall be subject to all applicable laws [*i.e.* general laws] enacted by the General Assembly.[2] Section 6 provides, *inter alia,* that "any local laws, or amendments thereto, relating to the incorporation, organization, government, or affairs of any municipal corporation" enacted before Art. XI-E became effective "shall be subject to any charter provisions, or amendments thereto, adopted under the provisions of this Article."

---

**1.** As originally enacted, ch. 731 exempted municipalities in a number of counties from its provisions. All such exemptions were subsequently repealed by ch. 451 of the Acts of 1973.

**2.** Section 5 of Art. XI-E permits the General Assembly to enact, amend or repeal "local laws" limiting the rate of municipal property taxation or the amount of municipal debt.

Nothing in Art. XI-E indicates that the General Assembly's power to enact public local laws for municipalities was being transferred to chartered counties. Had this been the intention, then manifestly Art. XI-E would not have expressly authorized home rule municipalities to repeal or supersede existing local laws relating to their incorporation, organization, government or affairs. Nor is there any indication in either Art. XI-A or Art. XI-E that the Legislature's retained power to act by general law applicable alike to all municipalities in the same class was to be shared with chartered counties, to be thereby exercised through enactment of county ordinances applicable to all municipalities in the county.

Article 23A, § 2, expressly granting broad governmental powers to all municipalities in the State, *is a public general law which cannot be transgressed by ordinances enacted by a chartered county.* Art. XI-A, §§ 1, 3. The general power is there vested in municipalities to pass ordinances, "not contrary to the public general or public local laws" deemed necessary "to assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, to secure persons and property from danger and destruction, and to protect the health, comfort and convenience of the citizens of the municipality." This grant of power is in all respects similar to — indeed the counterpart of — the express power contained in Art. 25A, § 5 (S) of the Code relating to chartered counties which we construed in *Mont. Citizens League v. Greenhalgh,* 253 Md. 151, 160-61, 252 A.2d 242 (1969), as a "broad grant of power" necessary to gratify the purposes of home rule government.

It is wholly inconsistent with the constitutional and statutory scheme of municipal home rule government to limit these broad express powers granted to municipalities by concluding, as the majority does, that ordinances of chartered counties are "public local laws" within the contemplation of § 2, as to which municipal ordinances enacted pursuant to the "general" powers granted by that section must yield in the event of a conflict.

The majority is simply wrong when it holds, in purported reliance upon our cases, that we have consistently viewed the enactments of a chartered county as the "public local laws" of that county. Referring to the authorities relied upon by the majority, *Ritchmount Partnership v. Board, supra,* 283 Md. at 57, states only that "the county has full power to enact local laws"; the case does not mention "public local laws." Similarly, in *Steimel v. Board,* 278 Md. 1, 6-8, 357 A.2d 386 (1976), the Court decided only the validity of a law enacted by the General Assembly which was applicable solely to one charter county. It was this law which we held to be a "public local law." Again, in *State's Atty. v. City of Balto.,* 274 Md. 597, 603-05, 337 A.2d 92 (1975), the law in question was enacted by the General Assembly. And in *County Council v. Investors Funding, supra,* 270 Md. at 413, the Court noted that the Montgomery County Council has the exclusive power to enact "*local* laws." The county's power *vel non* to pass "public local laws" was not mentioned. Similarly, dicta in *Co. Com'rs v. Supervisors of Elec.,* 192 Md. 196, 205, 63 A.2d 735 (1949), refers to "local laws," not public local laws. *State v. Stewart,* 152 Md. 419, 137 A.2d 39 (1927), indicates only that Baltimore City possesses legislative power, but there is no indication that its ordinances constitute "public local laws."

I do not believe that the term "public local law" has historically encompassed enactments by the county councils of chartered counties. On the contrary, at the time of the passage of Art. 23A, § 2 in 1947, the General Assembly enacted public local laws affecting single municipalities, and the limitation on the exercise of municipal powers under that section simply indicates that municipalities could not contravene such laws.

The only case which lends any support to the majority's position is *Scull v. Montgomery Citizens,* 249 Md. 271, 239 A.2d 92 (1968). We there referred to an enactment of the Montgomery County Council interchangeably as "a public local law" or as a "local law." *Id.* at 277. We said that counties have "the exclusive power to enact local laws," and

we noted that § 4 of Art. XI-A "forbids the legislature to enact a public local law 'on any subject covered by the express powers granted' [to the counties]." *Id.* at 274. Thus, while *Scull* indicates that the term "public local law" has been used in connection with county enactments, it also reveals that when this is so, the term "local law" has also been used. I think the use of the term "public local law" in *Scull* represents an inadvertent lack of precision on the part of this Court, rather than any determination that county enactments are "public local laws" in the traditional legislative sense.[3] Most certainly, in the sense contemplated by § 2 of Art. 23A, a "public local law" does not include an ordinance enacted by a chartered county.

The notion that a "public local law" within the contemplation of the prohibition of § 2 of Art. 23A includes a chartered county ordinance is also debunked by Art. 23B of the Maryland Code. As we pointed out in *Campbell v. City of Annapolis,* 289 Md. 300, 424 A.2d 738 (1981), Article 23B contains a model municipal charter for the use of any incorporated municipality and constitutes a grant of power by the General Assembly to the municipality if the people thereof choose to adopt it. Section 22 of Art. 23B closely parallels the "general powers" language contained in § 2 of Art. 23A but limits the prohibition upon the exercise of such powers to ordinances which are "contrary to the Constitution and laws of the State of Maryland." Manifestly, this limitation does not include the enactment of ordinances by chartered counties; it is the true measure of the legislative intention in Art. 23A, § 2 in prohibiting the passage of municipal ordinances which are contrary "to the public general or public local laws" of the State.

I do not, of course, share the majority view that the mere rejection of the Sobeloff Commission recommendation

3. Anne Arundel Co. v. McDonough, 277 Md. 271, 354 A.2d 788 (1976), also relied upon by the majority, does no more than quote that passage from *Scull,* albeit in a different context, which indicates that under the Montgomery County Charter the term "public local law" encompasses an ordinance of the county council. This, of course, is not determinative of the meaning of the term "public local law" as used by the General Assembly in § 2 of Article 23A.

concerning a limitation upon county licensing authorization to areas outside of the limits of incorporated municipalities indicates that chartered county licensing ordinances are applicable within home rule municipalities. This is indeed a slender reed upon which to predicate so important a constitutional interpretation. Nor do I share the majority's concern that some municipalities will die on the vine for lack of vital services unless ordinances of chartered counties are effective within municipalities. This concern is more appropriately addressed to the Legislature which is empowered by Art. XI-E, § 2, to classify municipal corporations into four classes and to enact public general laws as to such classes, as may be deemed necessary.

The majority concedes that its holding is a narrow one limited to the "type of conflict" presented in this case. It acknowledges that if a chartered county ordinance prohibited a municipality from exercising the express enumerated powers granted to it by Art. 23A, § 2 (1) - (31), or any other public general law, "an entirely different case would be presented." I glean from the majority opinion that because none of these enumerated powers encompassed an express power to the municipalities to prohibit fortunetelling within their corporate limits, their ordinances must yield to the contrary county ordinance. If this accurately reflects the majority holding, then I think it is in error in differentiating the "general" police power provided all municipalities under § 2 of Art. 23A from the specifically enumerated powers contained in subparagraphs (1) through (31) of that section. I would reverse the judgment of the Circuit Court for Prince George's County and hold that the municipal ordinances prevail over the conflicting county ordinance.

Judges Smith and Digges authorize me to say that they concur with the views herein expressed except as to the issue of conflict.

*Smith, J., dissenting:*

I would reverse for either of two reasons: (1) that under Maryland Constitution Art. XI-A, § 3, Prince George's County was not permitted to legislate on this subject within the corporate limits of the two towns, or (2) there is no actual conflict between the two ordinances. Thus, I agree with Chief Judge Murphy's dissent except as to the issue of conflict.

i. The constitutional provision

The majority states:

"The argument of the municipalities that the county law has no effect within municipal boundaries is based entirely upon the language of Art. XI-A, § 3, that the county council shall not legislate 'for any incorporated town, village or municipality.' This language, however, does not require the construction urged by the municipalities. The quoted language of § 3 can be construed a second way, namely that a county cannot enact laws effective only for or within a particular municipality and not effective elsewhere in the county. The use of the phrase 'for any ... municipality,' suggests that this second construction is the correct one. Moreover, in light of the purpose of Art. XI-A and the potential effects of a contrary result, we believe that the second construction represents the better reasoned approach."

The majority overlooks the reason advanced by the sponsor of that provision at the time. As reported in the Baltimore *Sun,* April 2, 1914, at 1, col. 1, it was intended to "prevent County Commissioners from interfering with the local ordinances of incorporated towns." Its sponsor was from Dorchester County with a 1910 population of 28,758 people,

but with about 22% or 6,407 concentrated in one incorporated town, Cambridge. I see no reason to believe that he was willing for interference by passage of a statute by a county applicable to more than one town, but objected to such interference if but one town were affected.

The majority states:

"Article XI-A, § 3, gives the county council 'full' legislative power to enact local laws on all matters covered by the grant of express powers under Art. XI-A, § 2. [(Citing cases.)] Subsequent to a county's organization under Art. XI-A, the General Assembly no longer has the constitutional authority to enact public local laws for the county on any subject covered by the express powers granted to home rule counties. Md. Const. Art. XI-A, § 4."

I find in the Constitution and in Maryland Code (1924) Art. 25A, the original express powers act, no authority granted to charter counties to legislate relative to the powers of incorporated towns. Prior to the adoption of Constitution Art. XI-E, this power would have continued with the General Assembly.

I do not see the drastic consequences of such a holding which the majority sees. Historically — and certainly at the time of the amendment in question — municipalities have provided much more by way of services to their residents than have counties.

It is plain to me that Senator Shepherd, when he proposed his amendment, which was unanimously approved by the Maryland Senate, intended that the charter county have no legislative prerogatives of any kind in a town within the grant of powers to the municipality.

### ii. Conflict

What we have here is a regulation obviously intended to police. fortune-telling. By the terms of Prince George's County Code § 5-156 (d) "[t]he total number of licenses that

may be currently outstanding shall not exceed one (1) for each eighty thousand (80,000) residents as reported in the latest U.S. Decennial Census and not more than two (2) licenses may be issued to members of the same family." The County in its brief indicates that under this provision "the number of fortune-telling licenses in the County is limited to eight" and that its "experience in recent years is that the same eight persons renew their licenses every year." The statute requires "[t]hree prints of recent and clear photographs, 2" x 2" in size, showing the head and shoulders of the applicant," one of which is to "be permanently affixed to the face of any license certificate issued . . . ." The application must contain "[a] statement as to whether the applicant has ever been convicted of a felony or misdemeanor" other than a motor vehicle violation, "and, if so, the nature of the offense, when and where convicted, and the penalty or punishment imposed therefor." An applicant is required to submit the names of at least three references, unrelated to him, "who will certify as to the applicant's good character and business responsibility." Moreover, § 5-158 requires each applicant to "be fingerprinted and photographed by the Prince George's County Police Department, and, said fingerprints and photographs shall be maintained in the regular and ordinary course of business of said police department."

In *Theatrical Corp. v. Brennan,* 180 Md. 377, 24 A.2d 911 (1942), Judge Ogle Marbury said for the Court:

"The question whether a particular Act is primarily a revenue measure or a regulatory measure is important, because different rules of construction apply. A regulatory measure may produce revenue, but in such a case the amount must be reasonable and have some definite relation to the purpose of the Act. A revenue measure, on the other hand, may also provide for regulation, but if the raising of revenue is the primary purpose, the amount of the tax is not reviewable by the courts. There is no set rule by which it can be determined

in which category a particular Act primarily belongs. In general, it may be said that when it appears from the Act itself that revenue is its main objective, and the amount of the tax supports that theory, the enactment is a revenue measure. 'In general, * * * where the fee is imposed for the purpose of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power; but where it is exacted solely for revenue purposes and its payment give the right to carry on the business without any further conditions, it is a tax.' 33 *Am. Jur., Licenses,* Paragraph 19, page 340." *Id.* at 381-82.

*Accord, Campbell v. City of Annapolis,* 289 Md. 300, 305, 424 A.2d 738 (1981); *Mont. Co. v. Md. Soft Drink Ass'n,* 281 Md. 116, 133-34, 377 A.2d 486 (1977) (quoting *Theatrical Corp. v. Brennan,* 180 Md. at 381-82); *American Nat'l v. M. & C. C.,* 245 Md. 23, 33-34, 224 A.2d 883 (1966) (quoting *Theatrical Corp. v. Brennan,* 180 Md. at 381-82).

The county license fee here is $250. Eight such licenses, the number to which the County says it is limited, thus would produce a total of $2,000 by way of revenue, a hardly significant sum in a county of 600,000 or more people. Thus, when one notes that fact and the general provisions of the licensing ordinance, it becomes obvious that this is intended as a regulatory measure, not as a revenue producing measure. The town ordinances here which forbid fortune-telling are simply more restrictive police regulatory measures.

The majority opinion relies upon *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 255 A.2d 376 (1969), for the proposition that "a political subdivision may not prohibit what the State by general public law has permitted," and thus that "[t]here is simply no way that the municipal ordinances *prohibiting* the practice of fortunetelling can be considered 'supplemental' to the county's authorization to

engage in the fortunetelling business." (Emphasis in original.) First of all, it might be helpful to look at exactly what the Court did say in *Sitnick:*

> "A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. Stated another way, unless a general public law contains an express denial of the right to act by local authority, the State's prohibition of certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation." *Id.* at 317 (emphasis in original).

It is plain to me that what we have here is a measure intended to regulate and severely restrict fortune-telling in Prince George's County. The towns have enacted a yet more restrictive ordinance, an absolute prohibition. In the context in which this case arises, I believe the town ordinance is good under *Sitnick.* If there is a view to the contrary, then to that extent I would overrule *Sitnick,* as much as I believe in the doctrine of stare decisis and the need for stability in court decisions.

### *Digges, J., dissenting:*

I, as does Judge Smith, agree with Chief Judge Murphy's dissent except in regard to his resolution of the conflict issue. Accordingly, with that reservation, I associate myself with both the views expressed by Chief Judge Murphy in his dissent as well as those stated by Judge Smith in his.